Jenna GODDARD, individually and on behalf of all others similarly situated, Plaintiff,

v.

GOOGLE, INC., a Delaware corporation, Defendant.

No. C 08–2738 JF (PVT).

United States District Court, N.D. California, San Jose Division.

July 30, 2009.

Kamberedelson, LLC, Chicago, IL, for Plaintiff.

Karen Johnson-McKewan, Kikka N. Rapkin, Nancy E. Harris, Nikka Noel Rapkin, Orrick Herrington & Sutcliffe LLP, San Francisco, CA, for Defendant.

## ORDER GRANTING MOTION TO DISMISS

JEREMY FOGEL, District Judge.

### I. BACKGROUND

Plaintiff Jenna Goddard ("Plaintiff") alleges that she and a class of similarly situated individuals were harmed as a result of clicking on allegedly fraudulent web-based advertisements for mobile subscription services. She alleges that Defendant Google, Inc. ("Google") illegally furthered this scheme. The facts are set forth more fully in this Court's previous order granting Google's motion to dismiss. *See Goddard v. Google,* No. C 08–2738 JF (PVT), 2008 WL 5245490 (N.D.Cal. Dec. 17, 2008). In support of its prior motion to dismiss, Google asserted that each of Plaintiff's claims was barred by § 230(c)(1) of the Communications Decency Act ("CDA"), which prevents a website from being treated as the "publisher or speaker" of third-party content, and thus typi-

cally immunizes website operators from liability arising from the transmission of such content.[1] As Google argued, claims that seek to impose liability on a website operator as the speaker or publisher of third-party content—or to impose liability that is "merely a rephrasing of" such speaker or publisher liability, *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096, 1106 (9th Cir. 2009)—are barred by the CDA unless the website also is an "information content provider," meaning that it "is 'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC (Roommates),* 521 F.3d 1157, 1162 (9th Cir.2008) (en banc) (quoting 47 U.S.C. § 230(f)(3)).

Faced with the implications of this clear analytic framework, which was articulated in the Ninth Circuit's 2008 *en banc* decision in *Roommates,* Plaintiff resorted to creative argument in an attempt to show that her claims did not seek to hold Google liable for the dissemination of online content at all. The Court rejected Plaintiff's artful pleading and dismissed the complaint. *See Goddard,* 2008 WL 5245490, at *4–7. Plaintiff was granted leave to amend, with express instructions that she attempt to "establish Google's involvement

---

1. Although "[c]ourts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content," *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir.2008), the Ninth Circuit recently noted in *Barnes* that "neither ... subsection [ (c)(1) ] nor any other declares a general immunity from liability deriving from third-party content," *Barnes,* 570 F.3d at 1099–1100 (referring to "the so-called immunity" provided by § 230). Nonetheless, immunity is defined as an "exemption from ... liability," Black's Law Dictionary (8th ed. 2004), and that is what § 230(c) provides, albeit not in every case. Thus, with the recognition that cases involving the application of § 230 require a "careful exegesis of the statutory language," *Barnes,* 570 F.3d at

1100, courts consistently have used the term "immunity" to describe the effect of the CDA's provisions. *See, e.g., Zeran,* 129 F.3d at 330 ("By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."); *see also Roommates,* 521 F.3d at 1164–65; *Doe,* 528 F.3d at 418; *Green v. America Online,* 318 F.3d 465, 471 (3d Cir. 2003); *Carafano v. Metrosplash,* 339 F.3d 1119, 1123–24 (9th Cir.2003); *Batzel v. Smith,* 333 F.3d 1018, 1029–35 (9th Cir. 2003); *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.,* 206 F.3d 980, 984–86 (10th Cir. 2000). This Court also will refer to the CDA's protections as a form of "immunity."

in 'creating or developing' the AdWords, either 'in whole or in part,'" so as to avoid CDA immunity. *Id.* at *7.

In her amended complaint, Plaintiff now alleges that "Google's involvement [in creating the allegedly fraudulent advertisements] was so pervasive that the company controlled much of the underlying commercial activity engaged in by the third-party advertisers." Amended Complaint ¶ 21. Plaintiff alleges that Google "not only encourages illegal conduct, [but] collaborates in the development of the illegal content and, effectively, requires its advertiser customers to engage in it." *Id.*[2] These allegations, if supported by other specific allegations of fact, clearly would remove Plaintiff's action from the scope of CDA immunity. The quoted allegations, however, are mere "labels and conclusions" amounting to a "formulaic recitation of the elements" of CDA developer liability, and as such, they "will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Rather, the Court must examine the pleading to determine whether Plaintiff alleges mechanisms that plausibly suggest the collaboration, control, or compulsion that she ascribes to Google's role in the creation of the offending AdWords. Having undertaken such an examination, the Court concludes that Plaintiff has not come close to substantiating the "labels and conclusions" by which she attempts to evade the reach of the CDA. Accordingly, her complaint once again must be dismissed.

## II. LEGAL STANDARD FOR DISMISSAL PURSUANT TO RULE 12(b)(6)

A complaint may be dismissed for failure to state a claim upon which relief may be granted for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir.1984). For purposes of a motion to dismiss, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994). A complaint should not be dismissed "unless it appears beyond doubt the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Clegg,* 18 F.3d at 754. However, a plaintiff is required to provide "more than labels and conclusions," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

## III. DISCUSSION

As explained at length in this Court's earlier order, the CDA has been interpreted to provide a "robust" immunity for internet service providers and websites, with courts "adopting a relatively expansive definition of 'interactive computer service' and a relatively restrictive definition of 'information content provider.'" *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1123 (9th Cir.2003). Thus, a website operator does not become liable as an "information content provider" merely by "augmenting the content [of online material] generally." *Roommates,* 521 F.3d at 1167–68. Rather, the website must contribute "materially ... to its alleged unlawfulness." *Id.* at 1167–68. A website does not so "contribute" when it merely provides third parties with neutral tools to create web content, even if the website knows that the third parties are using such tools to create illegal content. *See, e.g., id.*

**2.** On the basis of recent Ninth Circuit authority, Plaintiff also asks the Court to revisit its holding that her breach of contract claim impermissibly would treat Google as the speaker or publisher of third-party content. The Court addresses Plaintiff's contentions to that effect in Section III.B.

at 1169 & n. 24 (noting that where a plaintiff brings a claim "based on a website operator's passive acquiescence in the misconduct of its users," the website operator generally will be immune "even if the users committed their misconduct using tools of general availability provided by the website operator"); *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir.1997) (holding that provider is shielded from liability despite receiving notification of objectionable content on its website and failing to remove it).

## A. Developer liability

■ Plaintiff identifies several mechanisms by which Google allegedly contributes to the illegality of the offending advertisements, or even "requires" the inclusion of illegal content in such advertisements. Each of these mechanisms involves Google's "Keyword Tool," which Plaintiff describes as a "suggestion tool" employing an algorithm to suggest specific keywords to advertisers. Amended Complaint ¶ 22.[3] To demonstrate that the Keyword Tool is not a "neutral tool" of the kind uniformly permitted *within the scope of* CDA immunity, Plaintiff alleges that when a potential advertiser enters the word "ringtone" into Google's Keyword Tool, the tool suggests the phrase "free ringtone," and that this suggestion is more prevalent than others that may appear. Amended Complaint ¶ 22. Plaintiff contends that the suggestion of the word "free," when combined with Google's knowledge "of the mobile content industry's unauthorized charge problems," makes the Keyword Tool "neither innocuous nor neutral." Pl.'s Opp. at 7. Plaintiff also alleges that Google disproportionately suggests the use of the term "free ringtone" to ordinary users of Google's web search function, causing them to view the allegedly fraudulent MSSPs' AdWords with greater frequency.

Even assuming that Google is aware of fraud in the mobile subscription service industry and yet disproportionately suggests the term "free ringtone" in response to an advertiser's entry of the term "ringtone," Plaintiff's argument that the Keyword Tool "materially contributes" to the alleged illegality does not establish developer liability. The argument is nearly identical to that rejected by the Ninth Circuit in *Carafano v. Metrosplash*, 339 F.3d 1119 (9th Cir.2003). There, the defendant website provided its users with a "detailed questionnaire" that included multiple-choice questions wherein "members select[ed] answers . . . from menus providing between four and nineteen options." *Id.* at 1121. Although they included sexually suggestive phrases that might facilitate the development of libelous profiles, the menus of pre-prepared responses were considered neutral tools because "the selection of the content was left exclusively to the user." *Id.* at 1124–25 (rejecting argument that website's sixty-two questions and menu of "pre-prepared responses" was so extensive as to render it an information content provider, since quantitative scope of contribution was "a distinction of degree rather than of kind").

■ Under *Carafano*, even if a particular tool "facilitate[s] the expression of information," *id.* at 1124, it generally will be considered "neutral" so long as users ultimately determine what content to post, such that the tool merely provides "a framework that could be utilized for proper or improper purposes," *Roommates,*

---

**3.** Plaintiff also alleges that Google representatives meet with certain advertisers in order to assist them with the creation of AdWords, but she does not allege that these representatives

have contributed in any way to the allegedly illegal MSSP AdWords that give rise to this action.

521 F.3d at 1172 (interpreting *Carafano*). Indeed, as already noted, the provision of neutral tools generally will not affect the availability of CDA immunity "even if a service provider *knows* that third parties are using such tools to create illegal content." *Goddard*, 2008 WL 5245490, at *3 (emphasis added). As a result, a plaintiff may not establish developer liability merely by alleging that the operator of a website should have known that the availability of certain tools might facilitate the posting of improper content. Substantially greater involvement is required, such as the situation in which the website "elicits the allegedly illegal content and makes aggressive use of it in conducting its business." *Roommates*, 521 F.3d at 1172.

Like the menus in *Carafano*, Google's Keyword Tool is a neutral tool. It does nothing more than provide options that advertisers may adopt or reject at their discretion. *See* Pl.'s Opp. at 6 (conceding that advertisers' use of keywords is discretionary). "[T]he selection of the content [is] left exclusively to the user." *Carafano*, 339 F.3d at 1124–25. While a website clearly will not "*automatically* [enjoy] immun[ity] so long as the content originated with another information content provider," *Roommates*, 521 F.3d at 1171 n. 31 (citing *Carafano*, 339 F.3d at 1125), Plaintiff's allegations, if true, would not establish that Google did anything to encourage the posting of false or misleading AdWords, *cf. id.* at 1171–72, much less that Google "elicit[ed] ... [or] ma[de] aggressive use of [them] in conducting its business," *id.* at 1172. As in *Carafano*, where the dating website easily could have been expected to know that the inclusion of sexually suggestive options in its "pre-prepared" user profile responses might well

encourage libelous impersonations or pranks, *see Carafano*, 339 F.3d at 1121,[4] Plaintiff's suggestion that Google should have been aware of the danger of combining the words "free" and "ringtone" does not make Google a co-developer of the offending AdWords. Indeed, "the [allegedly misleading] posting[s] w[ere] contrary to [Google's] express polic[y]," *cf. Roommates*, 521 F.3d at 1171, which warns advertisers that they "are responsible for the keywords [they] select and for ensuring that [their] use of the keywords does not violate any applicable laws." *See* Amended Complaint, Ex. A.

The insufficiency of Plaintiff's theory becomes even more apparent in the context of her attempted analogy to the facts of *Roommates*, in which a housing website *required* potential subscribers to identify their sex, sexual orientation, and family status, and to indicate their preferred sex, sexual orientation, and family status in a potential roommate. The Ninth Circuit's partial denial of immunity to the website turned entirely on the website's decision to *force* subscribers to divulge the protected characteristics and discriminatory preferences "as a condition of using its services." *Id.* at 1164. Thus, while the court retreated from *Carafano*'s earlier suggestion in dicta that a website consisting of user-generated content "could *never* be liable because 'no [user] profile has any content until a user actively creates it,' " *Roommates*, 521 F.3d at 1171 (quoting *Carafano*, 339 F.3d at 1124) (emphasis added), it carved out only a narrow exception to that rule. *See Goddard*, 2008 WL 5245490, at *3; *see also Doe v. MySpace, Inc.*, 629 F.Supp.2d 663, 665 (E.D.Tex.2009) (finding *Roommates* "not applicable" to an action against the social utility website MyS-

---

4. For example, "pre-prepared responses" to a question regarding the poster's "main source of current events" apparently included the phrase "Playboy/Playgirl," while the question

"why did you call" included the response "looking for a one-night stand." *Carafano*, 339 F.3d at 1121.

pace.com, because, whereas "[t]he Ninth Circuit repeatedly stated throughout its *en banc* opinion that the Roommates.com website *required* its users to provide certain information as a condition of its use . . . ., users of MySpace.com are not *required* to provide any additional information to their profiles" (emphasis in original)); *Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F.Supp.2d 690, 701 (S.D.N.Y.2009) (noting that the *Roommates* decision "was based solely on the fact that . . . . Roommates.com . . ., in violation of federal and California state housing law, *required* potential subscribers" to engage in discriminatory conduct (emphasis in original)).

Recognizing the narrowness of the *Roommates* holding, Plaintiff alleges that Google effectively "requires" advertisers to engage in illegal conduct. Yet Plaintiff's use of the word "requires" is inconsistent with the facts that Plaintiff herself alleges. The purported "requirement" flows from Google's alleged "suggestion" of the phrase "free ringtone" through its Keyword Tool, and from the MSSPs' purported knowledge that only "free ringtones" generate substantial revenue-producing internet traffic. According to Plaintiff, MSSPs "[f]acing the Hobson's choice of accepting either Google's 'suggestions' or drastically reduced revenue . . . have accepted Google's 'suggestions' to include the keyword 'free' along with the keyword 'ringtone' in order to advertise to the majority of 'ringtone' searches, whether their products are free or not." Opp. at 8:4–8 (citing Amended Complaint ¶ 26).

In Google's apt paraphrase, Plaintiff is alleging "that Google's mathematical algorithm 'suggests' the use of the word 'free' in relation to 'ringtone' as a means of attracting more visitors to [the MSSPs'] sites, and that MSSPs whose offerings are not actually free are literally powerless to resist." This reasoning fails to disclose a "requirement" of any kind, nor does it suggest the type of "direct and palpable" involvement that otherwise is required to avoid CDA immunity. *Cf. Roommates*, 521 F.3d at 1169–70. Such involvement might occur where a website "remov[es] the word 'not' from a user's message reading '[Name] did *not* steal the artwork' in order to transform an innocent message into a libelous one." *Id.* at 1169. Even accepting Plaintiff's factual allegations as true, the allegations do not come close to suggesting involvement at such a level, or, indeed, that Google's AdWords program was anything other than "a framework that could be utilized for proper or improper purposes." *Id.* at 1172.

**B. Contract claims in light of *Barnes v. Yahoo!***

As in her original complaint, Plaintiff alleges that she and similarly situated individuals were intended third-party beneficiaries of Google's Advertising Terms, which in turn incorporate a Content Policy requiring that mobile subscription service advertisers display certain information about their products, including whether downloading the products will result in charges to the consumer. *See* First Amended Complaint, Ex. F. Plaintiff alleges that Google "breached" its Content Policy, and she urges the Court to reconsider the rationale for its prior dismissal of her breach of contract claim in light of the Ninth Circuit's recent decision in *Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir.2009).[5]

---

5. Plaintiff also urges the Court to deny the instant motion on the ground that CDA immunity is an affirmative defense that must be raised by the defendant in a responsive pleading. Plaintiff relies exclusively on *Barnes v.* *Yahoo!, Inc.*, 565 F.3d 560 (9th Cir.2009), in which the court stated that because "[t]he assertion of an affirmative defense does not mean that the plaintiff has failed to state a claim, [it] does not by itself justify dismissal

In *Barnes,* the court addressed whether Yahoo! enjoyed immunity against the plaintiff's claims that it either was negligent in undertaking to remove, or breached an oral contract to remove, offensive and unauthorized content posted about the plaintiff by her ex-boyfriend on one of Yahoo!'s public profile pages. *Id.* at 1098–99. The court reasoned that claims that a website negligently undertook to remove harmful or offensive content are barred by the CDA, since the action of removing or screening content "is quintessentially that of a publisher," and because "to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove." *Id.* at 1102–03. However, the court held that certain promissory conduct by a defendant may remove it from the protections of the CDA even where the alleged promise was to remove or screen third-party content, since "one can, and often does, promise to do something without actually doing it at the same time," thus giving rise to "a legal duty distinct from the conduct ... of a publisher." *Id.* at 1107.

Read as broadly as possible, *Barnes* stands for the proposition that when a party engages in conduct giving rise to an independent and enforceable contractual obligation, that party may be "h[eld] ... liable [not] as ` a publisher or speaker of third-party content, but rather as a coun-ter-party to a contract, as a promisor who has breached." *Id.* Theoretically, intended third-party beneficiaries—whose rights under a contract are different from those of the contracting parties but still are legally cognizable—could invoke the distinction drawn in *Barnes* between liability for acts that are coextensive with publishing or speaking and liability for breach of an independent contractual duty. In a third-party-beneficiary case, "as in any other contract case, the duty the defendant allegedly violated [would] spring[ ] from a contract—an enforceable promise—not from any non-contractual conduct or capacity of the defendant." *Id.* A court thus would be able to infer that the defendant had "implicitly agreed to an alteration" in the baseline rule that there is "no liability for publishing or speaking the content of other information service providers." *Id.* at 1108–09.

■■ In the instant case, there is no allegation that Google ever promised Plaintiff or anyone else, in any form or manner, that it would enforce its Content Policy. Under California law, "[i]f a contract is to be a basis of liability for the [defendant's] violation of [its own terms and conditions] ... [,] it must be a contract in which the [defendant] promises to abide by [these terms]." *Souza v. Westlands Water Dist.,* 135 Cal.App.4th 879, 892, 38 Cal.Rptr.3d 78 (2006); *see also*

---

under Rule 12(b)(6)." *Id.* at 563 (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)). The court observed that Yahoo!, the defendant, "ought to have asserted its affirmative defense by responsive pleading, which is the normal method of presenting defenses except for those specifically enumerated in Rule 12(b)." *Id.*

Beyond the fact that (1) *Barnes* held only that "section 230 is an affirmative defense and [is] to [be] treat[ed] ... as such," *id.* (emphasis removed), and (2) affirmative defenses routinely serve as a basis for granting

Rule 12(b)(6) motions where the defense is "apparent from the face of the [c]omplaint," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 564 F.Supp.2d 544, 550 (E.D.Va.2008) (granting Rule 12(b)(6) motion on the basis of CDA immunity); *see also Universal Commc'n Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413 (1st Cir.2007) (affirming Rule 12(b) (6) dismissal on the basis of CDA immunity); *Green,* 318 F.3d at 468 (same), the Ninth Circuit later deleted the entire relevant portion of its original *Barnes* opinion, *see Barnes,* 570 F.3d at 1097.

*Barnes*, 570 F.3d at 1108 ("[A] ... condition of the enforceability of a promise .... is that [it] be worded consistently with its being intended to be enforceable.") (quoting *Workman v. United Parcel Serv. Inc.*, 234 F.3d 998, 1001 (7th Cir.2000)). Google's Advertising Terms and incorporated Content Policy constituted a promise by Google's advertising customers to Google in exchange for participation in Google's advertising service. Neither agreement contains any promise *by Google* to enforce its terms of use or otherwise to remove noncompliant advertisements. *Cf. Green v. America Online*, 318 F.3d 465, 472 (3d Cir.2003) (holding that "Green failed to state a claim for breach of contract because ... by their terms, the Member Agreement and Community Guidelines were not intended to confer any rights on Green and AOL did not promise to protect Green from the acts of other subscribers").

▮ Moreover, even if Google had promised to enforce its Advertising Terms and incorporated Content Policy—and it did not—Plaintiff would not be a third-party beneficiary of that promise. In that scenario, Google would be the promisor under the agreement and each allegedly fraudulent MSSP would be a promisee. But a third party is not an intended beneficiary of an agreement unless the *promisee* intends the agreement to benefit the third party. *Souza*, 135 Cal.App.4th at 893, 38 Cal.Rptr.3d 78. For Plaintiff to be an intended third-party beneficiary of Google's alleged promise, the Advertising Terms would have to reflect an intent by each allegedly fraudulent MSSP to benefit Plaintiff. That proposition simply is illogical, and this Court, like the court in *Souza*, is "aware of no case in which a third-party-beneficiary contract was formed when a promisee bargained for and obtained a promisor's engagement to force the promisee to satisfy its own obligation to the third party." *Id.* at 894, 38 Cal.Rptr.3d 78.

Undoubtedly, the allegedly fraudulent MSSPs *did* promise to abide by the Content Policy, and Plaintiff might well sue *them* as an intended third-party beneficiary of their contract with Google. But Plaintiff's claim against Google rests not on any promise, but on a "general [content] policy ... on the part of [Google]," *Barnes*, 570 F.3d at 1108, a theory of liability that *Barnes* expressly precludes. Plaintiff's inability to point to any promise by Google, and her ultimate reliance on Google's Content Policy, reveals that unlike the claim in *Barnes*, which rested on a promise that scarcely could have been clearer or more direct,[6] Plaintiff's contract claim alleges liability that "is [not] different from, and [is] merely a rephrasing of, liability for negligent undertaking." *Id.* at 1106. This Court already has rejected Plaintiff's contract claim on that very ground, *see Goddard*, 2008 WL 5245490, at *5 (holding that breach of contract and negligent undertaking claims would treat Google as the publisher or speaker of third-party content, and dismissing both claims as indistinguishable), and now does so again.

## IV. CONCLUSION

As in the original complaint, each of Plaintiff's claims would treat Google as the publisher or speaker of third-party content. Yet Plaintiff has failed to allege facts that plausibly would support a conclusion that Google created or developed, in whole or in part, any of the allegedly fraudulent AdWords advertisements. Plaintiff offers numerous theories of such

---

**6.** The promise in *Barnes*—to remove the falsified and harmful profile page—was made by Yahoo!'s *Director of Communications*, who assured Barnes that she would "personally walk [Barnes'] statements over to the division responsible for stopping unauthorized profiles and [that] they would take care of [the problem]." *Barnes*, 570 F.3d at 1099.

involvement, but these theories merely lend truth to the Ninth Circuit's observation that there almost always will be *some* "argu[ment] that *something* the website operator did encouraged the illegality." *Roommates,* 521 F.3d at 1174. As the *en banc* court cautioned in *Roommates,* only

> [w]here it is *very clear* that the website directly participates in developing the alleged illegality ... [will] immunity ... be lost.... [I]n cases of enhancement by implication or development by inference[,] ... section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.

*Id.* at 1174–75 (emphasis added). Here, Plaintiff's theory is at best one of "enhancement by implication or development by inference." These "implications" and "inferences" fall well short of making it "very clear" that Google contributed to any alleged illegality, and Plaintiff's complaint clearly must be dismissed.

In assessing whether Plaintiff once again should be given leave to amend, the Court must consider "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party[,] and futility of the proposed amendment." *United States v. SmithKline Beecham, Inc.,* 245 F.3d 1048, 1052 (9th Cir.2001) (quoting *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 538 (9th Cir.1989)); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (providing factors constraining district court's discretion to deny leave to amend). At least two of the relevant factors compel denial of leave to amend in this case.

First, amendment almost certainly would be futile. In her original complaint and supporting arguments in opposition to Google's motion to dismiss, Plaintiff large-ly ignored the analytic framework provided by *Roommates* and other cases. While she did allege in conclusory fashion that Google assisted its AdWords customers in drafting their advertisements, she offered no allegations to support this claim and failed even to argue it in her papers. Now having been directed explicitly to do so, Plaintiff makes sweeping allegations of Google's involvement in the AdWords process but offers no more than tenuous "implications" and "inferences" that fail to explain how Google "controlled" or "collaborated" with any MSSP in the creation of any allegedly fraudulent advertisement. This minimally persuasive response to the Court's clear directive strongly suggests that amendment would be futile.

Second, the Ninth Circuit implicitly has identified a special form of "prejudice" to defendants who improperly are denied early dismissal of claims falling within the zone of CDA immunity. As the court stated in *Roommates,* "close cases .... must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to ... fight[ ] off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Roommates,* 521 F.3d at 1174. Because the CDA "must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles," *id.* at 1175, this Court's conclusion that Plaintiff almost certainly will be unable to state a claim compels the additional conclusion that Google must be extricated from this lawsuit now lest the CDA's "robust" protections be eroded by further litigation. For these reasons, Plaintiff's complaint will be dismissed without leave to amend.

**IT IS SO ORDERED.**