Hill v. StubHub, Inc., 2011 NCBC 7.

NORTH CAROLINA                               IN THE GENERAL COURT OF JUSTICE
                                                 SUPERIOR COURT DIVISION
GUILFORD COUNTY                                      07 CVS 11310

|  |  |
|---|---|
| JEFFREY A. and LISA S. HILL, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) **ORDER AND OPINION** |
| STUBHUB, INC. d/b/a "StubHub!" and/or "stubhub.com", JUSTIN HOLOHAN, and "John Doe Sellers 2, et al." | ) ) ) ) ) ) |
| Defendants. | ) |

{1}      This matter, filed as a class action, is before the Court on cross-motions for summary judgment filed by Plaintiffs and Defendant StubHub, Inc. ("StubHub"). At issue is Defendant StubHub's claim to immunity under Section 230 of the Communications Decency Act (the "CDA")[1]. For the reasons set forth below, the Court finds that StubHub is not entitled to immunity under the CDA and is, therefore, subject to Plaintiffs' claims for unfair and deceptive trade practices. Summary Judgment as to Plaintiffs' claims under N.C. Gen. Stat. § 75-1.1 is GRANTED.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by Jeffrey E. Oleynik, Charles E. Coble, and Benjamin R. Norman; Law Offices of Jeffrey K. Peraldo, P.A. by Jeffrey K. Peraldo and Kara W. Edmonds for Plaintiffs Jeffrey A. and Lisa S. Hill.*
>
> *K&L Gates, LLP by John H. Culver III; Cooley Godward Kronish LLP by Michael J. Klisch, Joshua M. Siegel, Michael G. Rhodes, Benjamin*

---

[1] 47 U.S.C. § 230.

*Chapman, Whitty Somvichian, and Craig Guthery for Defendant StubHub, Inc.*

Tennille, Judge.

## I.
## THE PARTIES

{2} Plaintiffs, Jeffrey A. and Lisa S. Hill ("the Hills"), are citizens and residents of Guilford County who purchased four tickets to the Miley Cyrus as Hannah Montana concert at the Greensboro Coliseum through StubHub's online service. The Hills paid more than face value for their tickets and paid a service fee in excess of $3.00. Their transaction, if conducted in front of the Greensboro Coliseum, would have violated North Carolina's anti-scalping statute.

{3} Defendant StubHub is a California corporation which operates a "ticket marketplace" on the internet. Stub Hub claims immunity from any responsibility for the sale to the Hills based on Section 230 of the CDA.

{4} Defendant Jason Holohan ("Holohan") is a citizen and resident of Massachusetts who owned the tickets purchased by the Hills through StubHub.

## II.
## APPLICABLE STATUTES

{5} The statutes applicable to this case are 47 U.S.C. § 230, N.C. Gen. Stat. § 14-344, and N.C. Gen. Stat. § 75-1.1. The pertinent language of Section 230 states:

> (c) Protection for "Good Samaritan" blocking and screening of offensive material.
> (1) Treatment of publisher or speaker. No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
> (2) Civil liability. No provider or user of an interactive computer service shall be held liable on account of--

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1) [subparagraph (A)]. . . .

(f) Definitions. As used in this section:

(1) Internet. The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service. The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider. The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

(4) Access software provider. The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

47 U.S.C. § 230(c),(f) (Lexis 2011).

{6}     In 2007, when Mrs. Hill purchased tickets for the Miley Cyrus as Hannah Montana concert on StubHub's website, N.C. Gen. Stat. § 14-344 read:

Any person, firm, or corporation shall be allowed to add a reasonable service fee to the face value of the tickets sold, and the person, firm, or corporation which sells or resells such

tickets shall not be permitted to recoup funds greater than the combined face value of the ticket, tax, and the authorized service fee. This service fee may not exceed three dollars ($ 3.00) for each ticket except that a promoter or operator of the property where the event is to be held and a ticket sales agency may agree in writing on a reasonable service fee greater than three dollars ($ 3.00) for the first sale of tickets by the ticket sales agent. This service fee may be a pre-established amount per ticket or a percentage of each ticket. The existence of the service fee shall be made known to the public by printing or writing the amount of the fee on the tickets which are printed for the event. Any person, firm or corporation which sells or offers to sell a ticket for a price greater than the price permitted by this section shall be guilty of a Class 2 misdemeanor.

N.C. Gen. Stat. § 14-344 (Lexis 2011); 2008 N.C. Sess. 158, ss. 3, 4.

{7}     North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."  N. C. Gen. Stat. § 75-1 (Lexis 2011.)

III.
CASE LAW GOVERNING IMMUNITY

{8}     The case law governing the question of loss of immunity as an internet service provider is not extensively developed.  The decisions are contextual, so their language provides no bright-line tests for when and how immunity may be lost.  It is clear that the CDA is an immunity statute designed to protect website operators from liability for content posted by others.  The Ninth Circuit stated that with respect to the CDA:

> We must keep firmly in mind that this is an immunity statute we are expounding, a provision enacted to protect websites against the evil of liability for failure to remove offensive content.  Websites are complicated enterprises, and there will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the

illegality. Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of *section 230* by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties. Where it is very clear that the website directly participates in developing the alleged illegality . . . immunity will be lost. But in cases of enhancement by implication or development by inference . . . *section 230* must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles. . . .

The message to website operators is clear: If you don't encourage illegal content, or design your website to require users to input illegal content, you will be immune.

*Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1174–75 (9th Cir. 2008) (internal citations omitted).

{9}　　A review of the cases below leads this court to conclude that an internet service provider crosses the line and becomes liable for content on its website when the internet service provider ("ISP") materially contributes to and/or specifically encourages the offending content. To "materially contribute" in this context means to influence the offending content in a way that promotes the violation of law that is represented by the offending content. To "specifically encourage" means to elicit and make aggressive use of the offending content in the business of the internet service provider. Each case must be decided on its own facts, giving deference to the public policy embodied in the statute. Cases in which the offending content is unlawful require a heightened degree of materiality and specificity. Intent to violate the law is not required. Conscious disregard by an internet service provider of known and persistent violations of law by content providers may impact the courts' determinations of the service provider's claim to immunity, especially where the ISP profits from the violations.

{10}　　Any survey of the law in this area begins with the Ninth Circuit's decision in *Roommates.com*. In his majority opinion, Chief Judge

Kozinski attempted to "plumb the depths of the immunity provided by Section 230 of the Communications Decency Act." [2] *Id.* at 1161. This Court will not dive as deep, but a close examination of the reasoning in the decision is helpful. Briefly, Roommates.com, LLC ("Roommate" or "Roommates")[3] was claiming immunity under Section 230 from claims by the plaintiffs that it violated the Fair Housing Standards Act by requiring users of its website to provide information which formed the basis of discrimination prohibited by the act. Roommate contended that it did not provide the "content" which formed the basis of the discrimination claim, pointing out that all the information was entered by users of the website.

{11}    Judge Kozinski's majority opinion began with a history of the CDA, which is important to note here. The legislation was passed in reaction to the decision in *Stratton Oakmont v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (unpublished), in which the New York courts had held Prodigy, an ISP, liable for content published on its website because it had made an effort to filter some of the posts. In effect, the decision placed ISPs in a dilemma of choosing to take responsibility for all messages posted or doing no monitoring at all and deleting no messages. The opinion places the history in context thusly: "In other words, Congress sought to immunize the *removal* of user-generated content, not the *creation* of content." *Roommates.com*, 521 F.3d at 1163. The act is a Good Samaritan protection. The CDA should be liberally construed to effectuate that public policy. It protects those ISPs which are truly innocent bystanders in use of the web.

{12}    Judge Kozinski next addressed the question of whether the questions asked by Roommate violated the Fair Housing Standards Act. Finding that there would have been a violation if asked by a broker or

---

[2] Subsequent decisions have either muddied the waters or made them clearer, depending on one's point of view. The depths have not become shallower.
[3] The company goes by the singular name Roommate.com, LLC but pluralizes the website's URL—www.roommates.com.

realtor, the Court held: "[i]f such questions are unlawful when posed face-to-face or by telephone, they don't magically become lawful when asked electronically online. The Communication Decency Act was not meant to create a lawless no-man's-land on the Internet." *Id.* at 1164. That analogy is meaningful here.

{13}    Next, the Ninth Circuit looked closely at the conduct of Roommate. Significantly, it held that a party responsible for putting information online may be subject to liability, even if the information originated with a user. It then looked at Roommate's activities in posting the questionnaire, soliciting the discriminatory information, and requiring answers to it. It held that those actions were entirely of Roommate's own doing and the CDA did not apply to them. In essence, Roommate was held to have developed the information. Thus, development of information by an ISP can be important in assessing a claim to immunity. But the court went further and found that information gathered by Roommate was filtered in a discriminatory way and that Roommate's connection to the discriminatory filtering was "direct and palpable." *Id.* at 1169. The court found Roommate's conduct to be in stark contrast to the conduct sought to be protected by the CDA, holding:

> Roommate's situation stands in stark contrast to *Stratton Oakmont*, the case Congress sought to reverse through passage of Section 230. There, defendant Prodigy was held liable for a user's unsolicited message because it attempted to *remove* some problematic content from its website, but didn't remove enough. Here, Roommate is not being sued for removing some harmful messages while failing to remove others; instead, it is being sued *for the predictable consequences of creating a website designed to solicit and enforce housing preferences that are alleged to be illegal.*

*Id.* at 1170 (emphasis in last sentence added).

{14}    The court emphasized that Roommate was not a passive conduit, but that it elicited the allegedly illegal content and made aggressive

use of it in conducting its business.  It held: "The message to website operators is clear: If you don't encourage illegal content, or design your website to require users to input illegal content, you will be immune." *Id.* at 1175.

{15}    *Roommates.com* was narrowly construed in the case of *Goodard v. Google, Inc.*, 640 F. Supp. 2d 1193 (N.D. Cal. 2009).  The District Court in that case held that immunity was not lost under *Roommates.com* even if the ISP knew that third parties are using its tools to create illegal content. *Goodard*, 640 F. Supp. 2d at 1198.  The Court stated:

> As a result, a plaintiff may not establish developer liability merely by alleging that the operator of a website should have known that the availability of certain tools might facilitate the posting of improper content.  Substantially greater involvement is required, such as the situation in which the website "elicits the allegedly illegal content and makes aggressive use of it in conducting its business."

*Id.* (quoting *Roommates.com*, 521 F.3d at 1172).

{16}    The next case is closely related to the issues here.  In *NPS, LLC v. StubHub, Inc.*, 25 Mass L. Rep. 478, 2009 Mass. Super. LEXIS 97 (2009), Justice Gants, then the business court judge in Massachusetts, heard a motion for partial summary judgment in a case brought by the New England Patriots football team to prevent StubHub from using its website to facilitate the scalping of tickets to Patriots games.  To be clear, this was only a hearing on partial summary judgment and not a final disposition of the case. However, certain of Justice Gants' observations in his decision are pertinent here.  With respect to StubHub's knowingly aiding in the violation of Massachusetts's anti-scalping law, he said:

> The Patriots, however, in seeking to prove that StubHub knowingly aided the commission of illegal conduct, is not limited to what StubHub said; it may also focus carefully on what it did. Here, StubHub's pricing structure certainly meant that it profited from any violation of the "anti-scalping" laws, since its revenue increased in direct proportion to the price of the ticket

sold.  Moreover, StubHub's website does not require the seller (or even ask the seller) the face value of the ticket, so there is no way for it or the buyer to know whether the sales price is above the price threshold set under §185D.  The absence of such information permits illegal ticket scalping to occur through the StubHub website and prevents any policing of the website to prevent such scalping.  StubHub's apparent affirmative choice not to know the face value of the tickets does not mean that it did not contribute to illegal scalping; willful blindness is certainly not a defense to this crime.  Finally, StubHub until 2008 affirmatively encouraged LargeSellers in the LargeSeller's Handbook to "check the website from time to time for underpriced tickets or exclusive listings that may not be seen elsewhere," and still encourages LargeSellers to buy these underpriced tickets by waiving for them the fee due from all other ticket buyers—10 percent of the sales price.  A factfinder reasonably may conclude that the so-called "underpriced" tickets are tickets priced within the legal limit set by §185D, and that StubHub, by encouraging LargeSellers to buy these tickets, is essentially encouraging LargeSellers to resell these tickets at higher prices, from which StubHub will enjoy a higher commission.  Therefore, this Court finds that there is a genuine issue of material fact as to whether StubHub is intentionally inducing or encouraging others to violate §§185A or 185D, or profiting from such violations while declining to stop or limit them.

*NPS, LLC*, 2009 Mass Super. LEXIS 97, at *32–34.

{17}    With respect to StubHub's claim of immunity under the CDA, Justice Gants applied virtually the same test, holding:

This Court recognizes that StubHub is an interactive computer service, that sellers who post their  tickets on StubHub are information content providers within the meaning of §230, and that StubHub does not lose the immunity provided by the CDA if it simply knew that its sellers were potentially in violation of G.L.c. 140, §185A or §185D.  *See Universal Communications Sys., Inc. v. Lycos,* 478 F.3d 413, 420 (1st Cir. 2007) ("Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content").

However, CDA immunity "applies only if the interactive computer service provider is not also an 'information content provider,' which is defined as someone who is 'responsible, in

whole or in part,' for the creation or development of the offending content." *Roommates,* 521 F.3d at 1162; 47 U.S.C. §230(f)(3). The Ninth Circuit has interpreted the term "development" as "referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness. In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." *Roommates,* 521 F.3d at 1167-68. Here, as discussed earlier, there is evidence in the record that StubHub materially contributed to the illegal "ticket scalping" of its sellers. In effect, the same evidence of knowing participation in illegal "ticket scalping" that is sufficient, if proven, to establish improper means is also sufficient to place StubHub outside the immunity provided by the CDA.

*NPS, LLC*, 2009 Mass Super. LEXIS 97, at *35–37.

{18} The next case providing guidance on the interpretation of the CDA is *FTC v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009). Of particular interest in *Accusearch* is the court's detailed explanation of the term "information content provider" as used in the CDA. The court was called upon to consider whether confidential telephone records are "developed" within the meaning of the CDA, when they are sold to the public over the Internet and who was "responsible," in whole or in part, for the development or creation of the offending content. *Accusearch*, 570 F.3d at 1197−1201. Its etymological investigation of the key words in the statute is long, but useful:

> The CDA defines the term *information content provider* as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). "This is a broad definition, covering even those who are responsible for the development of content only 'in part.'" [*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007)]. Accordingly, there may be several information content providers with respect to a single item of information (each being "responsible," at least "in part," for its "creation or development"). *See* 47 U.S.C. § 230(f)(3). . . .

The word *develop* derives from the Old French *desveloper*, which means, in essence, to unwrap. Webster's Third New International Dictionary 618 (2002) (explaining that *desveloper* is composed of the word *veloper*, meaning "to wrap up," and the negative prefix *des*). The dictionary definitions for *develop* correspondingly revolve around the act of drawing something out, making it "visible," "active,"or "usable." *Id*. Thus, a photograph is developed by chemical processes exposing a latent image. *See id*. Land is developed by harnessing its untapped potential for building or for extracting resources. *See id*. Likewise, when confidential telephone information was exposed to public view through Abika.com, that information was "developed." *See id*. (one definition of *develop* is "to make actually available or usable (something previously only potentially available or usable)").

This conclusion, however, does not end the inquiry. The question remains whether Accusearch was "'responsible, in whole or in part, for the . . . development of' the offending content." *Roommates.com*, 521 F.3d at 1162 (quoting § 230(f)(3)). That is, was it responsible for the development of the specific content that was the source of the alleged liability? . . .

The meaning of *responsible* becomes an issue under the CDA when a court is considering whether CDA immunity from liability is unavailable because one is "responsible, in whole or in part, for the creation or development of information" that is the source of the liability. In this context—responsibility for harm—the word *responsible* ordinarily has a normative connotation. *See* The Oxford English Dictionary 742 (2d ed. 1998) (stating one definition of *responsible* as "Morally accountable for one's actions."). As one authority puts it: "[W]hen we say, 'Every man is *responsible* for his own actions,' we do not think definitely of any authority, law, or tribunal before which he must answer, but rather of the general law of right, the moral constitution of the universe. . . ." James C. Fernald, Funk & Wagnalls Standard Handbook of Synonyms, Antonyms, and Prepositions 366 (1947). Synonyms for *responsibility* in this context are *blame, fault, guilt*, and *culpability*. *See* Oxford American Writer's Thesaurus 747 (2d ed. 2008). Accordingly, to be "responsible" for the development of offensive content, one must be more than a neutral conduit for that content. That is, one is not "responsible" for the development of offensive content if one's conduct was neutral

with respect to the offensiveness of the content (as would be the case with the typical Internet bulletin board). We would not ordinarily say that one who builds a highway is "responsible" for the use of that highway by a fleeing bank robber, even though the culprit's escape was facilitated by the availability of the highway.

This construction of the term *responsible* comports with the clear purpose of the CDA—to encourage Internet services that increase the flow of information by protecting them from liability when independent persons negligently or intentionally use those services to supply harmful content. *See* 47 U.S.C. § 230(a), (b). We therefore conclude that a service provider is "responsible" for the development of offensive content only if it in some way specifically encourages development of what is offensive about the content.

*Id.* at 1197.

{19}    The Tenth Circuit cited with approval the "material contribution" test adopted by the Ninth Circuit in *Roommates.com.* It then applied that test to the conduct of Accusearch, holding:

That language applies to Accusearch's role in this case. By paying its researchers to acquire telephone records, knowing that the confidentiality of the records was protected by law, it contributed mightily to the unlawful conduct of its researchers. Indeed, Accusearch's responsibility is more pronounced than that of Roomates.com. Roommates.com may have encouraged users to post offending content; but the offensive postings were Accusearch's *raison d'etre* and it affirmatively solicited them.

*Id.* at 1200.

{20}    The Tenth Circuit made another series of observations that demonstrates the language the courts have used in finding immunity for message boards that provided only neutral tools for posting. It distinguished its own case of *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online, Inc.*, 206 F.3d 980 (10th Cir. 2000), by pointing out that America Online was not responsible for erroneous stock quotations on its website because its conduct was neutral with respect to the errors. It said that its decision would have been different

if America Online had solicited inherently unlawful content. *See id.* at 984−86. It relied on the fact that America Online had done nothing to encourage what made the content offensive. *Id.* Other cases have found immunity where the ISP did not prompt and did not cause the content. *See Universal Commc'n Sys.*, 478 F.3d at 420; *Chic. Lawyers' Comm. for Civil Rights Under Law, Inc., v. Craigslist, Inc.*, 519 F.3d 666, 671−72 (7th Cir. 2008).

## IV.
### ANALYSIS

{21}   Many of the facts at this stage are undisputed. How those facts affect the analysis of immunity under the CDA is hotly contested. The facts pertinent to that analysis are set forth below. The questions are whether StubHub is an information content provider, in whole or in part, and whether its transactions violated N.C. Gen. Stat. §14-344 as it existed at the time, irrespective of whether it was a content provider.

{23}   There is no dispute about the transaction upon which the claims of individual Plaintiffs Jeffrey A. Hill and Lisa S. Hill are founded.

{24}   StubHub operates a website, which it calls a "ticket marketplace," that enables third parties to buy and sell tickets to live entertainment events, including sporting events. For purposes of this decision the Court finds that StubHub does not generally own the tickets sold on its website.[4]

{25}   To utilize the website, a buyer or seller must register for a user account. The registration process requires the user to read and agree to StubHub's User Agreement by checking the "Agree" box with which all internet users have become familiar. Among the fine print in the lengthy user agreement is the following language:

---

[4] There may be instances where StubHub is the actual owner, but they are immaterial for purposes of this decision.

You agree not to use this Site for unlawful purposes or in an unlawful manner. You agree to comply with all applicable local, state federal and international laws, statutes and regulations regarding use of the Site and the selling of tickets. . . .

You warrant that you will comply with all applicable local, state, federal and international laws, statutes and regulations regarding use of the Site and selling value of the tickets. StubHub does not monitor, obtain, nor have any knowledge of the face value of tickets listed on the Site.

Goldberg Aff. at ¶¶ 10–11, Ex. 1 ¶¶ 9.5, 11.3.

{26} StubHub also provided notice that ticket scalping is illegal in North Carolina.

{27} On July 17, 2006, Justin Holohan, a resident of Massachusetts, registered as a StubHub user and agreed to the terms of the User Agreement.

{28} On September 15, 2007, Holohan listed four tickets to the Miley Cyrus as Hannah Montana concert at the Greensboro Coliseum for sale at a price of $149.00 per ticket. That price exceeded the face value of the tickets by $93.00 per ticket. September 15 was the day the tickets went on sale at the Coliseum. On that same day, Lisa Hill was unsuccessful in obtaining tickets to the concert from the Greensboro Coliseum website. It was sold out, apparently within minutes. Mrs. Hill then went to the StubHub website, where she found four tickets listed for $149.00, those being the same tickets listed for sale by Mr. Holohan. She used her husband's credit card, authorizing StubHub to charge the account for the full amount on the Place Order page at the StubHub website. In addition to the $596.00 price of the four tickets, she paid a service fee of $59.60 (10% of the value of the four tickets) and a shipping/handling charge of $11.95.[5] While Mrs. Hill has filed an affidavit saying she did not know the face value of the tickets was $56.00 until she received them in the mail, she should have had little doubt that she

---

[5] For the concert as a whole, StubHub collected approximately $126,000.00 above the face value of the tickets and $41,947.25 in fees in excess of the $3.00 fee authorized by the statute.

was paying a premium and could certainly have obtained information about the face value before making her purchase. Like most purchasers of tickets to sold-out events, she should have expected that the tickets were not offered at face value or at least made some inquiry. In any event, she was a willing purchaser at that price.

{29} For his part, Mr. Holohan testified that he used the fixed price method on the website, typing in $149.00 in the blank. StubHub did not set the price for him. Apparently, Mr. Holohan had used StubHub on more than one occasion, as he testified that he was generally familiar with the pop-up windows but did not know if he used them on the occasion that he listed his Hannah Montana tickets. As a Massachusetts resident, he would only have had access to the Average Price window and not the Historical Sales Tool. Both are described below. Holohan had no part in setting the buyer's fee and shipping charges. StubHub did that.

{30} In order to sell tickets on the website, a seller like Holohan must first locate the event on the website by selecting one of several links on the home page and then selecting the location from which the seller will be shipping the tickets.

{31} StubHub has been proactive before the seller even gets to the website. StubHub is selective in the events it lists on its website. It focuses on high-demand events which are generally sold out events. Unlike Craigslist, EBay, or other sales websites, sellers are limited to those events selected by StubHub. StubHub screens out low-demand listings. It actively monitors its inventory for each selected event. Its business model is thus focused at the outset on sales of tickets to events with a high probability of garnering premium prices above the face value of the event ticket. It is not in the business of selling tickets to just any event.

{32} StubHub has also taken other action before the seller or buyer gets to the website. It actively solicits listings for high-demand events. It monitors its competition for listings.

## A.
## LargeSellers

{33}    The most significant activity engaged in by StubHub which affects the pricing on its website is its connection with LargeSellers.  Justice Gants noted in the New England Patriots case: "In addition to the above services, in 2005 StubHub created a category of sellers it has identified as "LargeSellers." *NPS, LLC*, 2009 Mass Super. LEXIS 97, *7–8.  As defined by StubHub, LargeSellers are those who "'take a large interest in tickets spanning over multiple events and genres' for whom StubHub provides extended privileges and incentives above those provided to its regular users." *Id.*  LargeSellers are not in the business of buying large amounts of tickets to be resold at face value.  They could not profit from such a business model.  They control large blocks of tickets, a control which gives them an advantage in setting premium prices for sold out events.  They are in the business of scalping tickets.

{34}    StubHub has approximately 900 participants in the LargeSellers program, and the program generates 30% to 50% of its ticket sales.  StubHub provides account managers to assist LargeSellers.  They provide assistance with pricing.  LargeSellers are given an additional day to list their tickets (a service unavailable to the average customer), the privilege of last minute transactions, cash-back incentives for achieving certain benchmarks, and reduced rates.  LargeSellers are entitled to a reduction in the normal 15% service fee charged to sellers if they achieve certain benchmarks.  StubHub entices LargeSellers to use its website.

{35}    StubHub influences the pricing of the LargeSellers.  StubHub has technology that allows it to upload data from LargeSellers' software.  Called "autobulk," this technology gives StubHub the ability to monitor the pricing of its LargeSellers.  It uses features by which LargeSellers can automatically have their prices increased to cover the seller service fee charged by StubHub, effectively passing the service fee on to the buyer who is

already paying a 10% buyer's fee.  StubHub makes more on the buyers fee if the LargeSeller builds the seller service fee into the price.  The use of the mark-up feature is voluntary with each Large Seller. If a Large Seller reaches its benchmarks so that its fee is reduced, StubHub automatically adjusts the pricing to reflect the reduced fee.

{36}    StubHub affects pricing in other ways through its LargeSellers.  It encourages them to look for and purchase underpriced tickets on the website.  It then encourages them to get the underpriced tickets off the market by waiving the buy-side fee.  The policy thus encourages raising the price for all tickets.

{37}    Setting the right price is critical to StubHub's business model.  It makes no money if no tickets are sold; therefore, it has an incentive to keep overpriced inventory off the website.  However, the higher the price of the ticket, the more money it makes.  Thus, its success is based on driving pricing to the "market value."  Given its focus on LargeSellers in the business of making a profit on re-sales, market value for sold out events is more likely than not going to exceed face value of the ticket.  That is especially true where LargeSellers are automatically marking up their wholesale prices to include the seller service fee.

{38}    It should be clear that by focusing on LargeSellers, who are in business to make a profit on re-sales, assisting them in pricing, and generating a significant portion of its revenue from them, StubHub creates a pricing process that assures that the market price of a ticket will exceed the face value with respect to at least 30% to 50% of its sales.  However, the influence of LargeSeller pricing does not end there.


B.
Users other than LargeSellers

{39}    The influence of the LargeSellers' pricing spills over into the pricing of tickets sold by other users.  Since the LargeSellers are such a large

percentage of StubHub's business, they influence the market price for tickets. If LargeSellers are seeking a profit on re-sales of tickets to sold out events, their pricing would naturally drive the market to prices above face value. StubHub affirmatively acts to impact pricing to the extent that it seeks to drive prices to a market level. Often that may mean driving the prices down from overpriced listings. It wants tickets to sell. If they do not sell, it does not make any money.

{40} Whichever way the price is moved, StubHub is still impacting price. There can be little doubt that StubHub seeks to influence prices to drive them to market value. The target is market value of tickets to sold-out events; the target is not face value. While StubHub never "sets" the price entered by a seller, it does seek to drive that price to a market level. To that extent, it is impacting the price content entered on its website—and doing so deliberately and to drive its profit. StubHub is in the business to make money, and there is nothing wrong with that. Its method of driving profit is, however, a significant factor when determining its claim to immunity under the CDA.

{41} How does StubHub influence pricing for users other than Large Sellers?

{42} It studies pricing behavior in order to maximize its ticket sales. From its studies, it was able to devise pricing tools and services to foster competitive pricing on its website.

{43} It provided a customer service that instructs season ticket holders on pricing. StubHub customer service gives "general guidance" on pricing to individual sellers and to LargeSellers.

C.

StubHub uses its website to drive pricing to market value, the very content it now wishes to disavow influencing

{44}    More importantly, it uses its website to influence pricing, seeking to drive prices to a level which StubHub believes will result in a sale at "market value." That is not necessarily a price above face value, but certainly the targeted market value could be a premium price in excess of face value. If market value is being driven by LargeSellers who control large blocks, it is likely that the price will exceed face value. When a seller goes to the website to list a ticket, he or she is given pricing data on the last five comparable completed transactions. If the seller lists a price outside the average range for comparable tickets, the seller is warned. When the seller moves to the page where she enters a ticket price, StubHub provides a feature that displays the price for which other users have sold their tickets. Users may also go to a link that shows "How Much Should I Charge For My Ticket." Users are told that tickets priced reasonably or below market value should sell quickly. If sellers enter a price outside of what StubHub has determined is the average price range, a pop-up window appears as a "Seller Tip" which states: "Tickets to this event, in your section have been selling at an average price of $$$$ each. Would you like to adjust your ticket price to increase its chances of selling?"

{46}    Users are told their chances of tickets selling faster will be improved.

{47}    A similar service is available for users on a page called "My Active Ticket Listings." Again, pop-up windows encourage users to "Optimize Your Ticket Pricing" and provide information to help users find a "competitive" price.

{48}    All of the popup windows and tools such as the Average Price window and the Historical Sales Tool are designed to influence the sales price.[6] They contain pricing influenced by Large Sellers.

---

[6] The Average Price Tool is a program in StubHub's website that informs sellers that they entered a price for their tickets that is higher than the average price for tickets sold on the site for a particular event. (Aff. of Noah Goldberg ¶¶ 26–27.) The website displays a pop-up window when sellers enter a price that is more than 1% higher than the average price for an

{45}    StubHub's business model does not require scalping practices. It encourages them.  It is designed to produce the highest volume of ticket sales at the prevailing market price for events which are sold out, and thus likely to generate market prices higher than the face value of the tickets irrespective of the fees involved on both sides.[7]  Having engaged in detailed studies of pricing and pricing habits of its users and competitors, it strains credulity that StubHub had no information about the relation of market value to face value.  It could not reasonably drive its customers' prices to market value without that information.  It does not provide information on the face value of tickets to buyers on its website.  Further, it controls its website to prevent communication between buyers and sellers, thus facilitating its role as the arbiter of market price.

## D.
### StubHub's Fees

{46}    The Court next turns to the fees charged by StubHub.  It generally charges a seller a fee of 15%.  While it is possible that some sellers would absorb that cost, it is unlikely that a seller of a ticket to a sold out event would not pass on the seller's fee expense in order to break even on the transaction.  LargeSellers are clearly encouraged to do that, and StubHub's system facilitates the mark-up.  The existence of the seller's fee does not violate N.C. Gen. Stat. § 14-344.  Its existence contributes to the setting of prices above face value.

{47}    On the other hand, the buyer's fee charged by StubHub, not the seller, directly contravenes the statute.  If a StubHub employee stood in front

event.  (Aff. of Noah Goldberg ¶ 26.)  The Historical Sales Tool is a program on StubHub's website that displays historical sales information to the seller during the ticket posting process.   (Aff. of Noah Goldberg ¶ 24.)  The tool shows the last five transactions that occurred for the event, the price at which the tickets sold, and the date of the sale.
[7] There are rare instances involving disgruntled sports fans who dump their tickets at any price.

of the Greensboro Coliseum before the Hannah Montana concert and offered to sell tickets (belonging to someone else) at face value, and <u>if</u> the buyer would pay a buyer's fee that exceeded $3.00, that employee would have violated the statute and been subject to prosecution. That process is precisely what takes place on StubHub's website. It is charging the buyer's fee directly, collecting and retaining it. That transaction violates the statute if the fee is more than $3.00.

E.
StubHub's Involvement in the Sale

{48} StubHub is involved in the process between the buyer and seller in numerous other ways. It controls payment and delivery, prohibiting contact between buyer and seller. It profits from its delivery charges. It serves as a guarantor to both the buyer and seller. It contracts with bands like the Dave Matthews Band to loan them the money to buy tickets to their own concerts at face value, which StubHub then resells for them. StubHub guarantees the face value will be received and pays any premium received to the band. It advises the band on the market value of the tickets for the tour and enters the tickets in its system. It occasionally sells tickets on its own, but those sales are too insubstantial to affect the market price. It operates kiosks where tickets can be picked up.

{49} These activities standing alone do not make StubHub a content provider, but they demonstrate that StubHub is in total control of the transaction. The only thing it does not do is enter the actual price or make the final price decision for most sellers. It is the party conducting the transaction even though it is not setting the price. Again, if a StubHub employee offered to sell another person's tickets to the ACC Tournament at scalper's prices in front of the coliseum, that employee would have violated the statute even though they did not set the price for the owner.

# V.
# CONCLUSION

{50}     StubHub did not set the price at which Mrs. Hill purchased the tickets.  It did not enter the price in the blank on its website.  It used all the right disclaimers and warnings in its user agreement and on its website.  However, its actions speak louder than its words.  It provided, for its own profit, a means by which Mr. Holohan and other sellers, in particular LargeSellers, could scalp tickets in a manner which would have violated North Carolina law if done in person and not by use of the internet.  It directly participated in <u>developing</u> the pricing on its system.  If it did not know the face value of the tickets sold on its website—an assertion the Court would find difficult to accept—it was consciously indifferent about and willfully blind to that information.  At the least, StubHub encouraged illegal content.  Phrased differently, the use of its website to scalp tickets in violation of North Carolina law was a predictable consequence of its business model.

{51}     StubHub encouraged, materially contributed to, and made aggressive use of the pricing content on its website.  It profited from tickets sold at prices higher than face value.  It was consciously indifferent and willfully blind to the illegal prices being posted, knowing that the predictable consequences of its pricing model would be the generation of illegal prices.  It is not entitled to immunity.  It does not qualify as a Good Samaritan.

{52}     For the foregoing reasons the Court concludes that: (1) StubHub is a content provider and is stripped of any immunity under the CDA, and (2) its activities, especially its buyer's fees, were in violation of N.C. Gen. Stat. § 14-344 at the times complained of in the complaint irrespective of its immunity.  The CDA would provide no immunity for those transactions by its very terms.  Charging prices and fees in excess of those statutorily permitted is an unfair and deceptive trade practice.  The facts set out above clearly

establish that StubHub's actions were "in and affecting commerce" as required by N.C. Gen. Stat. § 75-1.1.

{53}    There are class action issues remaining to be decided.  In the view of the Court, there is no just reason for delay in entry of judgment on the individual claims.  It is further the trial court's view, subject to determination by the Court of Appeals, that the Court's denial of immunity affects a substantial right of StubHub and that an immediate review of the denial of immunity would promote judicial economy and efficiency.

{54}    It is, therefore, ORDERED, ADJUDGED, AND DECREED that:
1. Defendant StubHub's Motion for Summary Judgment is denied.
2. Plaintiffs' Motion for Summary Judgment is granted with respect to  Plaintiffs' individual claim that StubHub's conduct violated N.C. Gen. Stat. § 75-1.1 and that StubHub is not entitled to immunity under § 230 of the CDA.
3. The Court enters no ruling with respect to the class claims asserted, but finds that there is no just reason for delay of entry of judgment on the individual claims.

IT IS SO ORDERED, this 28th day of February, 2011.