# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP344 |
| COMPLETE TITLE: | Yasmeen Daniel, Individually, and as Special Administrator of the Estate of Zina Daniel Haughton, |
| |        Plaintiff-Appellant, |
| | Travelers Indemnity Company of Connecticut, as Subrogee for Jalisco's LLC, |
| |        Intervening Plaintiff, |
| |    v. |
| | Armslist, LLC, an Oklahoma Limited Liability Company, Brian Mancini and Jonathan Gibbon, |
| |        Defendants-Respondents-Petitioners, |
| | Broc Elmore, ABC Insurance Co., the fictitious name for an unknown insurance company, DEF Insurance Co., the fictitious name for an unknown insurance company and |
| | Estate of Radcliffe Haughton, by his Special Administrator Jennifer Valenti, |
| |        Defendants, |
| | Progressive Universal Insurance Company, |
| |        Intervening Defendant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 382 Wis. 2d 241,N.W.2d 211
PDC No:2018 WI APP 32 - Published

| | |
|---|---|
| OPINION FILED: | April 30, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 14, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Milwaukee |
|   JUDGE: | Glenn H. Yamahiro |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | A.W. BRADLEY, J. dissents (opinion filed). |
|   NOT PARTICIPATING: | ABRAHAMSON, J. did not participate. |

ATTORNEYS:

For the defendants-respondents-petitioners, there were briefs filed by *Eric J. Van Schyndle*, *Joshua D. Maggard*, *James*

*E. Goldschmidt*, and *Quarles & Brady LLP*, Milwaukee. There was an oral argument by *James E. Goldschmidt*.

For the plaintiff-appellant, there was a brief filed by *Patrick O. Dunphy*, *Brett A. Eckstein*, and *Cannon & Dunphy, s.c.*, Brookfield. With whom on the brief were *Jacqueline C. Wolfe*, *Samantha J. Katze*, and *Manatt, Phelps & Phillips, LLP*, New York, New York; along with *Jonathan E. Lowy* and *Brady Center To Prevent Gun Violence*, Washington, D.C. There was an oral argument by *Jonathan E. Lowy*.

An amicus curiae brief was filed on behalf of National Coalition Against Domestic Violence, End Domestic Abuse Wisconsin: The Wisconsin Coalition Against Domestic Violence, Legal Momentum, Et al. by *Brian T. Fahl* and *Kravit, Hovel & Krawczyk, S.C.*, Milwaukee. With whom on the brief were *Anthony J. Dreyer* and *Skadded, Arps, Slate, Meagher & Flom LLP*, New York, New York.

An amicus curiae brief was filed on behalf of Everytown for Gun Safety by *Crystal N. Abbey* and *Menn Law Firm, LTD.*, Appleton. With whom on the brief were *Michael J. Dell*, *Karen S. Kennedy*, and *Kramer Levin Naftalis & Frankel LLP*, New York, New York.

An amicus curiae brief was filed on behalf of Floor64, Inc., D/B/A The Copia Institute by *Kathryn A. Keppel*, *Steven C. McGaver*, and *Gimbel, Reilly, Guerin, & Brown LLP*, Milwaukee. With whom on the brief was *Catherine R. Gellis, Esq.*, Sausalito, California.

An amicus curiae brief was filed on behalf of Cyber Civil Right Initiative and Legal Scholars by *Jeffrey A. Mandell*, *Gregory M. Jacobs*, and *Stafford Rosenbaum LLP*, Madison.

An amicus curiae brief was filed on behalf of American Medical Association and Wisconsin Medical Society by *Guy DuBeau* and *Axley Brynelson, LLP*, Madison. With whom on the brief were *Leonard A. Nelson*, *Erin G. Sutton*, and *American Medical Association*, Chicago, Illinois.

An amicus curiae brief was filed on behalf of Computer and Communications Industry Association by *Andrew T. Dufresne* and *Perkins Coie LLP*, Madison. With whom on the brief were *Brian M. Willen*, *Jason B. Mollick*, and *Wilson Sonsini Goodirch & Rosati Professional Corporation*, New York, New York.

An amicus curiae brief was filed on behalf of Members of the United States Congress on the Meaning of the Communications Decency Act by *Emily Lonergan*, *John C. Peterson*, and *Peterson, Berk, & Cross, S.C.*, Appleton. With whom on the brief were *Gregory M. Dicknson* and *Harter Secrest & Emery LLP*, Rochester, New York.

An amicus curiae brief was filed on behalf of Electronic Frontier Foundation by *Peyton B. Engel*,  *Marcus J. Berghahn*, and *Hurley Burish, S.C.*, Madison.

**2019 WI 47**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP344
(L.C. No. 2015CV8710)

STATE OF WISCONSIN      :      IN SUPREME COURT

Yasmeen Daniel, Individually, and as Special Administrator of the Estate of Zina Daniel Haughton,

     Plaintiff-Appellant,

Travelers Indemnity Company of Connecticut, as Subrogee for Jalisco's LLC,

     Intervening Plaintiff,

     v.

Armslist, LLC, an Oklahoma Limited Liability Company, Brian Mancini and Jonathan Gibbon,

     Defendants-Respondents-Petitioners,

Broc Elmore, ABC Insurance Co., the fictitious name for an unknown insurance company, DEF Insurance Co., the fictitious name for an unknown insurance company and Estate of Radcliffe Haughton, by his Special Administrator Jennifer Valenti,

     Defendants,

Progressive Universal Insurance Company,

     Intervening Defendant.

**FILED**

**APR 30, 2019**

Sheila T. Reiff
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. We review a decision of the court of appeals[1] reversing the circuit court's[2] dismissal of Yasmeen Daniel's complaint against Brian Mancini, Jonathan Gibbon, and Armslist, LLC (collectively "Armslist"). Daniel's tort action arose from a mass shooting in a Brookfield, Wisconsin spa that killed four people, including Daniel's mother Zina Daniel Haughton. Daniel alleged that the shooter, Radcliffe Haughton, illegally purchased the firearm after responding to private seller Devin Linn's post on Armslist's firearm advertising website, armslist.com. The court of appeals held that 47 U.S.C. § 230 (2018),[3] the federal Communications Decency Act of 1996 (CDA), did not bar Daniel's claims against Armslist for facilitating Radcliffe's illegal purchase.

¶2 We disagree, and conclude that § 230(c)(1) requires us to dismiss Daniel's complaint against Armslist. Section 230(c)(1) prohibits claims that treat Armslist, an interactive computer service provider,[4] as the publisher or speaker of

---

[1] *Daniel v. Armslist, LLC*, 2018 WI App 32, 382 Wis. 2d 241, 913 N.W.2d 211.

[2] The Honorable Glenn H. Yamahiro of Milwaukee County presided.

[3] All references to federal statutes are to the 2018 version unless otherwise noted.

[4] An "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

(continued)

2

information posted by a third party on its website. Because all of Daniel's claims for relief require Armslist to be treated as the publisher or speaker of information posted by third parties on armslist.com, her claims are barred by § 230(c)(1). Accordingly, we reverse the decision of the court of appeals, and affirm the circuit court's dismissal of Daniel's complaint.

## I. Background[5]

¶3 In October 2012, a Wisconsin court granted Zina Daniel Haughton a restraining order against her husband, Radcliffe Haughton, after he had assaulted her and threatened to kill her. Pursuant to the restraining order, Radcliffe was prohibited by law from possessing a firearm for four years. See Wis. Stat. § 941.29(1m)(f) (2017-18).[6] Despite this court order, Radcliffe posted a "want to buy" advertisement on armslist.com and stated that he was seeking to buy a handgun with a high-capacity magazine "asap." He then viewed an offer of sale posted by Devin Linn on armslist.com for a semiautomatic handgun. Using armslist.com's "contact" function, he emailed Linn to arrange to purchase the handgun. The two exchanged phone numbers and set

It is uncontested that Armslist is an interactive computer service provider.

[5] Because we review defendant Armslist, LLC's motion to dismiss, we accept all of the factual allegations in Daniel's complaint as true. See Data Key Partners v. Permira Advisers LLC, 2014 WI 86, ¶17, 356 Wis. 2d 665, 849 N.W.2d 693.

[6] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

up a meeting by phone. On October 20, they met in a McDonald's parking lot in Germantown, Wisconsin. Linn sold Radcliffe the gun, along with ammunition, for $500.

¶4 On October 21, one day after Radcliffe had purchased the handgun from Linn, he carried it into the Azana Spa and Salon in Brookfield, Wisconsin, where Zina worked. He fatally shot Zina and two other people, injured four others, and shot and killed himself. Yasmeen Daniel was inside the building at the time and witnessed the shooting.

¶5 Armslist.com is a classified advertising website similar to Craigslist. Prospective sellers may post advertisements for firearms and firearm-related products they wish to sell, prospective buyers may post "want advertisements" describing the firearms they wish to buy. Buyers and sellers may contact one another either through personal contact information they provide on the website, or by using armslist.com's "contact" tool. According to the complaint, Armslist receives revenue through advertising on armslist.com; there is no allegation that Armslist itself participates in the purchase and sale of firearms beyond allowing users to post and view advertisements and contact information on armslist.com.

¶6 According to Daniel's allegations, Radcliffe shopped for the murder weapon exclusively on armslist.com because he recognized that the website's design features made it easier for prohibited purchasers like him to illegally purchase firearms. Armslist.com allows potential buyers to use a "seller" search filter to specify that they want to buy firearms only from

4

private sellers, rather than from federally licensed dealers. Private sellers, as opposed to federally licensed gun dealers, are not required to conduct background checks in Wisconsin. The website also does not require buyers or sellers to create accounts, which encourages anonymity, and displays next to each advertisement whether the account is registered or unregistered.

¶7 Armslist.com allows users to flag content for a number of different reasons, including "scam," "miscategorized," and "overpriced," and uses these flags to delete certain posts. However, it does not allow users to flag content as "criminal" or "illegal" and does not take action to delete illegal content. The website contains no restrictions on who may create an account, or who may view or publish firearm advertisements using its website. The website's lack of restrictions allows buyers to avoid state-mandated waiting periods and other requirements. Armslist does not provide private sellers with legal guidance as to federal and state laws governing the sale of firearms.

¶8 Daniel's complaint also suggests several simple measures Armslist could have taken in order to reduce the known risk of illegal firearm sales to dangerous prohibited purchasers. Daniel alleges that Armslist could have required buyers to create accounts and provide information such as their name, address, and phone number. In states similar to Wisconsin, where there is online access to an individual's criminal history, Armslist could have required potential buyers to upload their criminal history before their accounts were approved. She alleges Armslist could have allowed users to flag

5

potentially illegal firearm sales. It could have prohibited users from obtaining one another's contact information until Armslist confirmed their legal eligibility to buy and sell firearms. According to the complaint, all these measures would have reduced the risk of firearm sales to persons prohibited from owning a firearm.

¶9 Based on all these features and omissions, Daniel's complaint alleges that Armslist knew or should have known that its website would put firearms in the hands of dangerous, prohibited purchasers, and that Armslist specifically designed its website to facilitate illegal transactions. The causes of action asserted against Armslist are negligence, negligence per se, negligent infliction of emotional distress, civil conspiracy, aiding and abetting tortious conduct, public nuisance, and wrongful death.[7] Armslist argued that the CDA immunizes it from liability for the information posted by third parties on armslist.com, and moved to dismiss Daniel's complaint for failure to state a claim upon which relief can be granted pursuant to Wis. Stat. § 802.06(2)(a)6.

¶10 The circuit court granted Armslist's motion and dismissed the complaint. The circuit court explained that the relevant question under the CDA is not whether the complaint calls the defendant a publisher, but whether the cause of action

---

[7] The complaint also asserts causes of action against Devin Linn and the Radcliffe Haughton Estate that are not at issue here.

6

requires the court to treat the defendant as the publisher of third-party content. The CDA immunizes an interactive computer service provider from liability for passively displaying content created by third parties, even when the operator exercises "traditional publisher functions" by deciding "what content can appear on the website and in what form." Armslist.com's design features "reflect choices about what content can appear on the website and in what form," and are therefore "editorial choices that fall within the purview of traditional publisher functions." For this reason, the circuit court concluded that the CDA bars all of Daniel's claims against Armslist.

¶11 The court of appeals reversed. Daniel v. Armslist, LLC, 2018 WI App 32, ¶5, 382 Wis. 2d 241, 913 N.W.2d 211. The court of appeals held that the CDA does not protect a website operator from liability for its own actions in designing and operating its website. Id., ¶42. According to the court of appeals, armslist.com's design features could be characterized as "content" created by Armslist, so Daniel's claims did not require the court to treat Armslist as the publisher of third-party content. Id., ¶44. Additionally, holding Armslist liable for its own operation of its website did not require treating it as a publisher or speaker of third-party content. Id., ¶42.

¶12 The court of appeals acknowledged that a large body of federal case law has interpreted the CDA as providing immunity when an interactive computer service provider exercises a publisher's "traditional editorial functions," such as providing a forum for third parties to post content. Id., ¶¶48-49.

7

However, the court of appeals concluded that all of these cases "read[] into the Act language that is not present" and rejected them all as unpersuasive.  Id. ¶¶48-50.  We granted Armslist's petition for review, and now reverse the decision of the court of appeals.

## II.  DISCUSSION

### A.  Standard of Review

¶13 We review a motion to dismiss for failure to state a claim upon which relief may be granted, and in so doing we must interpret and apply a statute.  "Whether a complaint states a claim upon which relief can be granted is a question of law for our independent review; however, we benefit from discussions of the court of appeals and circuit court."  Data Key Partners v. Permira Advisers LLC, 2014 WI 86, ¶17, 356 Wis. 2d 665, 849 N.W.2d 693 (citation omitted).  "When we review a motion to dismiss, factual allegations in the complaint are accepted as true for purposes of our review.  However, legal conclusions asserted in a complaint are not accepted, and legal conclusions are insufficient to withstand a motion to dismiss."  Id., ¶18 (citations omitted).  "Statutory interpretation and the application of a statute to a given set of facts are questions of law that we review independently," while benefiting from the interpretations and applications of other Wisconsin court decisions.  Marder v. Bd. of Regents of Univ. of Wis. Sys., 2005 WI 159, ¶19, 286 Wis. 2d 252, 706 N.W.2d 110.

8

B. The Communications Decency Act

¶14 The CDA is set out in 47 U.S.C. § 230. The CDA was enacted in large part to "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." § 230(b)(2). Congress found that the internet had "flourished, to the benefit of all Americans, with a minimum of government regulation." § 230(a)(4). For this reason, Congress sought to prevent state and federal laws from interfering with the free exchange of information over the internet.

¶15 Limiting interference from federal and state laws includes protecting interactive computer service providers who operate forums for third-party speech from the "specter of tort liability" for hosting third-party content. Jones v. Dirty World Entm't Recordings LLC, 755 F.3d 398, 407 (6th Cir. 2014) (quoting Zeran v. Am. Online, Inc., 129 F.3d 327, 331 (4th Cir. 1997)). The imposition of tort liability for hosting third-party content would have an "obvious chilling effect" on the free exchange of information over the internet, Jones, 755 F.3d at 407 (citing Zeran, 129 F.3d at 331), as it would deter interactive computer service providers from hosting third-party content. This would significantly impede the free exchange of information over the internet. See Jones, 755 F.3d at 408.

¶16 Section 230(c)(1) addresses this problem by immunizing interactive computer service providers from liability for publishing third-party content. The subsection states: "No

9

provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." § 230(c)(1). The act also preempts any state tort claims: "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." § 230(e)(3). Section 230(c)(1) therefore prevents the specter of tort liability from undermining an interactive computer service provider's willingness to host third-party content.

¶17 At the same time, however, Congress did not want to discourage interactive computer service providers from voluntarily screening obscene or unlawful third-party content, as some state courts had done. See, e.g., Stratton Oakmont, Inc. v. Prodigy Servs. Co., 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (unpublished) (holding that an interactive computer service provider could be treated as the publisher of some defamatory statements posted by third parties on its site because it had voluntarily deleted other offensive third-party posts). Section 230(c)(2) addresses this concern by shielding an interactive computer service provider from liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." Section 230(c) ensures that as a "Good Samaritan," an interactive computer service provider may remove some objectionable third-party content from

10

its website without fear of subjecting itself to liability for objectionable content it does not remove. Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 669-70 (7th Cir. 2008).

¶18 Therefore, rather than force interactive computer service providers to screen objectionable content, Congress chose to simply remove disincentives for screening such content voluntarily. See, e.g., id. at 670 (explaining that Congress chose to deal with the problem of liability for hosting third-party content "not with a sword but with a safety net."); see also Zeran, 129 F.3d at 331. Together, § 230(c)(1) & (2) allow interactive computer service providers to be "indifferent to the content of information they host or transmit: whether they do (subsection (c)(2)) or do not (subsection (c)(1)) take precautions, there is no liability under either state or federal law." Chi. Lawyers' Comm., 519 F.3d at 670.

¶19 Section 230(c)(1) is the subsection central to this case. The text of subsection (c)(1) supplies three criteria that must be satisfied before the CDA bars a plaintiff's claims: (1) the defendant "is a 'provider or user of an interactive computer service'; (2) the claim is based on 'information provided by another information content provider'; and (3) the claim would treat [the defendant] 'as the publisher or speaker' of" the information. Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 19 (1st Cir. 2016) (citations omitted); see also Klayman v. Zuckerberg, 753 F.3d 1354, 1357 (D.C. Cir. 2014).

11

¶20 Daniel does not dispute that Armslist, LLC, as the operator of armslist.com, is an interactive computer service provider. Her arguments involve the second and third criteria of § 230(c)(1). She challenges the second criterion by arguing that Armslist, through the design and operation of its website, helped to develop the content of the firearm advertisement such that the information was not exclusively provided by Linn. This would make Armslist an information content provider with respect to the advertisement; and therefore, place it outside of the CDA's protection. She challenges the third criterion by arguing that her claims are not based on Armslist's publication of content at all, but are instead based on Armslist's facilitation and encouragement of illegal firearm sales by third parties. If Daniel's claims do not require Armslist to be treated as the publisher or speaker of Linn's advertisement, then the CDA does not bar her claims.

## C. Information Content Provider

¶21 Regarding the second criterion of Section 230(c)(1), CDA immunity exists only when the plaintiff's claims are based on content provided by another information content provider. If a defendant is an "information content provider" for the content at issue, then the defendant is not entitled to CDA immunity. § 230(c)(1); Jones, 755 F.3d at 408. An information content provider is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3). "A website operator can simultaneously

12

act as both a service provider and content provider." Jones, 755 F.3d at 408; see also Fair Hous. Council of San Fernandino Valley v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir. 2008). In short, an interactive computer service provider, such as Armslist, is not liable for publishing a third party's content, but may be liable for publishing its own content.

¶22 A defendant is an information content provider with regard to content published on the internet only if the defendant is "responsible, in whole or in part, for the creation or development[8]" of the content. Section 230(f)(3). Courts have recognized that the word "development" cannot be read too broadly or too narrowly. On one hand, an overly broad reading could render an interactive service provider "responsible for the development of content created by a third party merely by displaying or allowing access to it." Jones, 755 F.3d at 409. This would "swallow[] up every bit of the immunity that the section otherwise provides," effectively writing § 230(c)(1)'s immunity provision out of the statute. Roommates.com, 521 F.3d at 1167.

¶23 On the other hand, an overly narrow reading of the word "development" risks ignoring the phrase "in whole or in part." See § 230(f)(3). It cannot be the case that an interactive computer service provider is categorically immune

---

[8] Linn, not Armslist, created the firearm advertisement. The issue in this case is whether Armslist helped to "develop" the content of the advertisement.

13

from liability for any exercise of its publishing, editorial, and screening functions; a website operator who removes the word "not" from a third party's post stating that "[Name] did <u>not</u> steal the artwork" is responsible for developing potentially defamatory content. <u>Roommates.com</u>, 521 F.3d at 1169. For this reason, courts recognize that "despite the CDA, <u>some</u> state tort claims will lie against website operators acting in their publishing, editorial, or screening capacities." <u>Jones</u>, 755 F.3d at 410.

¶24 In order to avoid these two extremes and to remain faithful to the text and purpose of § 230, courts use the "material contribution" test to determine whether a website operator is responsible for the "development" of content. "[A] website helps to develop unlawful content, and thus falls within [Section 230(f)(3)], if it contributes materially to the alleged illegality of the conduct." <u>Roommates.com</u>, 521 F.3d at 1168. A material contribution "does not mean merely taking action that is necessary to the display of allegedly illegal content," such as providing a forum for third-party posts. <u>Jones</u>, 755 F.3d at 410. "Rather, it means being responsible for what makes the displayed content allegedly unlawful." <u>Id.</u>

¶25 The Ninth Circuit's decision in <u>Roommates.com</u>, 521 F.3d 1157, demonstrates how the material contribution test operates. Housing website Roommates.com required users to disclose their sex, race, sexual orientation, and whether they will bring children to the household in order to use the site. <u>Id.</u> at 1161. It also required renters to list their roommate

14

preferences regarding these characteristics. Id. It was illegal under the Fair Housing Act and California anti-discrimination law for renters to request this information. Id. at 1161-62. After selecting their preferences, users could access the "Additional Comments" section, a blank text box for users to "describe [themselves] and what [they] are looking for in a roommate." Id. at 1173. Some renters posted discriminatory preferences in this text box, such as "prefer white Male roommates" or "NOT looking for black [M]uslims." Id. The Fair Housing Council sued Roomates.com for violating the Fair Housing Act and state anti-discrimination laws. Id. at 1162.

¶26 The Ninth Circuit concluded that the CDA immunized Roommates.com from liability for the content of the "Additional Comments" section, but not for the required disclosures of characteristics like race and sex. Id. at 1165-67. The information posted in the "Additional Comments" section "comes entirely from subscribers and is passively displayed by Roommate." Id. at 1174. Roommates.com did not contribute to the unlawfulness of this content, but merely provided a place for the content to be posted. In contrast, the required disclosures of protected characteristics did amount to the development of content, making Roommates.com an information content provider with respect to these disclosures. Id. at 1167-68. By requiring users to enter characteristics and preferences such as age, race, sex, and sexual orientation as a condition of using the website, and by designing its website to

15

hide listings from certain users based on these protected characteristics, Roommates.com materially contributed to the illegality of the content itself. Id. at 1169.

¶27 Decisions from other federal courts interpreting the CDA are helpful in distinguishing when a defendant has materially contributed to the illegality of third-party content from when a defendant has merely published content created by someone else. In Chi. Lawyers' Comm., owners of apartment buildings posted discriminatory advertisements on Craigslist's housing section in violation of the Fair Housing Act. Chi. Lawyers' Comm., 519 F.3d at 668. Plaintiffs sued Craigslist for allegedly "causing" these Fair Housing Act violations. Id. at 671. The Seventh Circuit held that the CDA barred the plaintiffs' claims, explaining that "[o]ne might as well say that people who save money 'cause' bank robbery." Id. While Craigslist was responsible for the illegal content "in the sense that no one could post a discriminatory ad if [C]raigslist did not offer a forum," id., Craigslist did not materially contribute to the illegality of the content.

¶28 Similarly, in Goddard v. Google, Inc., 640 F. Supp. 2d 1193 (N.D. Cal. 2009), a class of plaintiffs alleged that Google materially contributed to the illegality of fraudulent advertisements posted by Google's advertising customers. The claims were based on Google's "Keyword Tool," which suggested specific keywords to Google's advertising customers. If an advertiser entered the word "ringtone," for example, the tool suggested the phrase "free ringtone." Id. at 1197. Some

16

advertisers using this tool falsely advertised their ringtones as "free," resulting in unauthorized charges to consumers. Id. The plaintiffs argued that Keyword Tool's suggestion made Google a "developer" of the third-party advertisers' fraudulent content. Id.

¶29 The district court rejected this argument. Even assuming that Google was aware its Keyword Tool was being used to create illegal content, the Keycite Tool was a "neutral tool" much like the additional comments section in Roommates.com: it "merely provide[d] a framework that that could be utilized for proper or improper purposes." Id. (quoting Roommates.com, 521 F.3d at 1172). Additionally, there is no good faith requirement in § 230(c)(1). Therefore, an interactive computer service provider will not be liable for providing neutral tools "even if a service provider knows that third parties are using such tools to create illegal content." Id. at 1198 (citations omitted).

¶30 In contrast to these cases, in which the interactive computer service provider merely made illegal content more easily available, courts have denied CDA immunity when an interactive computer service provider materially contributes to the illegality of the content itself. FTC v. LeadClick Media, LLC, 838 F.3d 158 (2nd Cir. 2016), provides an example of a material contribution. LeadClick was an affiliate-marketing business that connected its clients to third-party publishers (affiliates), who then published the clients' advertisements on the internet. Some of LeadClick's affiliates used fake news websites to advertise a LeadClick client's weight loss products,

17

and included false and misleading information such as fake customer reviews. Id. at 164-65. LeadClick's employees directed affiliates to make specific edits to advertisements in order to avoid being "crazy [misleading]." For example, a LeadClick employee told an affiliate to make a false advertisement appear "more 'realistic'" by lowering the amount of falsely claimed weight loss. Id. at 176.

¶31 The Federal Trade Commission brought an action for deceptive trade practices, and the Second Circuit held that the CDA did not immunize LeadClick. Id. LeadClick "developed" the unlawful advertisements by materially contributing to the illegality of the deceptive content, making it an information content provider of the content at issue. Id. For this reason, the claim was not based on content provided by another information content provider, and accordingly, there was no CDA immunity. Id.

¶32 The concept of "neutral tools" provides a helpful analytical framework for figuring out whether a website's design features materially contribute to the unlawfulness of third-party content. A "neutral tool" in the CDA context is a feature provided by an interactive computer service provider that can "be utilized for proper or improper purposes." Goddard, 640 F. Sup. 2d at 1197 (citing Roommates.com, 521 F.3d at 1172). A defendant who provides a neutral tool that is subsequently used by a third party to create unlawful content will generally not be considered to have contributed to the content's unlawfulness. See Roommates.com, 521 F.3d at 1169. See also Herrick v.

18

Grindr, LLC, 306 F. Supp. 3d 579, 589 (S.D.N.Y. 2018) ("An [interactive computer service provider] may not be held liable for so-called 'neutral assistance,' or tools and functionality that are available equally to bad actors and the app's intended users") (citations omitted).

¶33 Examples of such neutral tools include a blank text box for users to describe what they are looking for in a roommate, Roommates.com, 521 F.3d at 1173, a rating system that allows consumers to award businesses between one and five stars and write reviews, Kimzey v. Yelp! Inc., 836 F.3d 1263, 1270 (9th Cir. 2016), and a social media website that allows groups to create profile pages and invite members. Klayman v. Zuckerberg, 753 F.3d at 1358. All of these features can be used for lawful purposes, so the CDA immunizes interactive computer service providers from liability when these neutral tools are used for unlawful purposes. See § 230(c)(1).

¶34 This is true even when an interactive computer service provider knows, or should know, that its neutral tools are being used for illegal purposes. In Carafano v. Metrosplash.com, Inc., 339 F.3d 1119 (9th Cir. 2003), for example, an actress sued a dating website after a third party created a dating profile in her name and posted her address. Id. at 1121. She asked the website operator to remove the post and the operator initially refused, although it was later taken down. Id. at 1122. Despite the operator's awareness of the unlawful content, the operator was immune under the CDA because it was not responsible for developing the content. Id. at 1125. Instead,

19

it merely provided a neutral tool that could be used for lawful or unlawful purposes. Id.; see also Roommates.com, 521 F.3d at 1171 (explaining that in Carafano, "the website provided neutral tools, which the anonymous dastard used to publish the libel").

¶35 Finally, the Ninth Circuit clarified in Roommates.com that the difference between a neutral design feature and the development of unlawful content is the potential for lawful use. If a dating website had required users to enter their race, sex, and sexual orientation through the same drop-down menus as used by Roommates.com, and filtered results based on those characteristics, the dating website would retain its CDA immunity. Id. at 1169. This is because "[i]t is perfectly legal to discriminate along those lines in dating." Id. at 1169 n.23. In contrast, filters based on these characteristics have no lawful use in the housing context, so they are not "neutral tools" in the housing context. Stated otherwise, the filters can be used only for unlawful purposes in a housing context. Therefore, if a website's design features can be used for lawful purposes, the CDA immunizes the website operator from liability when third parties use them for unlawful purposes.

¶36 In this case, Armslist did not develop the content of Linn's firearm advertisement, so Armslist is not an information content provider with respect to the advertisement.[9] Daniel's

---

[9] To the extent Daniel argues that some of her claims are not based on the content of the advertisement at all, this argument is addressed in Section II. D.

20

argument is based primarily on the assertion that Armslist's design features make it easier for prohibited purchasers to illegally obtain firearms. She asserts that Armslist should have known, actually knew, or even intended that its website would facilitate illegal firearm sales to dangerous persons.

¶37 One obvious problem with Daniel's argument is that § 230(c)(1) contains no good faith requirement. Therefore, the issue is not whether Armslist knew, or should have known, that its site would be used by third parties for illegal purposes. Instead, the issue is whether Armslist was an information content provider with respect to Linn's advertisement. Armslist.com's provision of an advertising forum and the related search functions are all "neutral tools" that can be used for lawful purposes. Sales of firearms by private sellers are lawful in Wisconsin. Further, private sellers in Wisconsin are not required to conduct background checks, and private sales are not subject to any mandatory waiting period. Accordingly, the option to search for offers from private sellers is a tool that may be used for lawful purposes.

¶38 The remainder of the design features referenced in Daniel's complaint—lack of a "flag" option for illegal activity, failing to require users to create an account, failure to create restrictions on who may post or view advertisements, and failing to provide sufficient legal guidance to sellers—are voluntary precautions that the CDA permits but does not require. See, e.g., Cohen v. Facebook, Inc., 252 F. Supp. 3d 140, 158 (E.D.N.Y. 2017) (suit against Facebook for failure to adequately

21

screen terrorist activity was barred by the CDA); Chi. Lawyers' Comm., 519 F.3d at 670 (explaining that the CDA allows an interactive computer service provider to be "indifferent" to the content of third-party posts). Whether or not Armslist knew illegal content was being posted on its site, it did not materially contribute to the content's illegality.

¶39 Daniel attempts to evade the CDA by asserting that creators of armslist.com intended for the website to make illegal firearm sales easier. This is an attempt to distinguish this case from the litany of cases dismissing suits against website operators who failed to screen unlawful content. As the First Circuit has recognized, however, the allegation of intent is "a distinction without a difference" and does not affect CDA immunity. Backpage.com, 817 F.3d at 21.

¶40 The Ninth Circuit in Roommates.com explained the dangers of allowing allegations of intent or implied encouragement to defeat motions to dismiss in CDA cases:

> [T]here will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality. Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties. Where it is very clear that the website directly participates in developing the alleged illegality . . . immunity will be lost. But in cases of enhancement by implication or development by inference . . . section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.

22

Roommates.com, 521 F.3d at 1174-75. Therefore, allowing plaintiffs to escape the CDA by arguing that an interactive computer service provider intended its neutral tools to be used for unlawful purposes would significantly diminish the protections offered by § 230(c)(1).

¶41 The text and purpose of the CDA require us to reject Daniel's intent argument. Again, § 230(c)(1) contains no good faith requirement; we analyze only whether Armslist materially contributed to the unlawfulness of third-party content such that it "developed" the content as provided in § 230(f)(3). Because it did not, it is not an information content provider with respect to the content; therefore, Daniel's claims depend on content provided only by third parties.

D. Treatment as Publisher or Speaker

¶42 Section 230(c)(1) of the CDA prohibits only those claims that would treat the interactive computer service provider as the "publisher or speaker" of third-party content. See, e.g., Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1107 (9th Cir. 2009) (concluding that the CDA did not bar a plaintiff's promissory estoppel claim against an interactive computer service provider who had promised to remove unlawful third-party content and then failed to do so, as the claim was not based on its publication of unlawful content, but on a promise that induced reliance and was not kept). If a plaintiff's claims do not require the interactive computer service provider to be treated as a publisher or speaker, then the CDA does not immunize the interactive computer service provider from suit.

23

¶43 However, courts do not merely ask whether the plaintiff's complaint calls the defendant a "publisher" or "speaker." "[W]hat matters is not the name of the cause of action . . . what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." Barnes, 570 F.3d at 1101-02. In other words, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" Id. at 1102. This rule prevents plaintiffs from using "artful pleading" to state their claims only in terms of the interactive computer service provider's own actions, when the underlying basis for liability is unlawful third-party content published by the defendant. Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007); see also Kimzey, 836 F.3d at 1266 ("[w]e decline to open the door to such artful skirting of the CDA's safe harbor provision.").

¶44 In Doe v. Myspace, Inc., 528 F.3d 413 (5th Cir. 2008), for example, a child was sexually assaulted after creating a profile on social media website myspace.com and using the site to arrange a meeting with her assailant. Id. at 416. The plaintiffs sued Myspace, asserting that their claims were not based on Myspace's publication of third-party content, but only on its "failure to implement basic safety measures to protect minors." Id. at 419. The Fifth Circuit rejected the plaintiffs' attempt to artfully plead their claims only in terms of Myspace's own actions: "[t]heir allegations are merely

24

another way of claiming that MySpace was liable for publishing the communications and they speak to MySpace's role as a publisher of online third-party-generated content." Id. at 420. Stated otherwise, the duty that MySpace allegedly violated——the duty to implement safety measures to protect minors——derived from the defendant's status as the publisher or speaker of content provided by another.

¶45 The First Circuit came to a similar conclusion in Backpage.com, LLC, 817 F.3d 12. Backpage.com was a classified advertising website similar to Craigslist, allowing third-party users to post goods or services for sale in different categories. Id. at 16. Three minors became victims of sex trafficking after third parties advertised them on backpage.com's "Adult Entertainment" section. Id. at 17. The plaintiffs sued Backpage.com for "a course of conduct that allegedly amounts to participation in sex trafficking," in violation of the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). Id. at 18. The claims were based on the design features of backpage.com, such as the lack of phone or email verification, the stripping of metadata from uploaded photographs, and the failure of the website's automated filtering system to sufficiently block prohibited terms. Id. at 17, 20. The plaintiffs attempted to distinguish cases such as Myspace by alleging that Backpage.com deliberately designed its website to make sex trafficking easier. Backpage.com, LLC, 817 F.3d at 17, 21.

25

¶46 The First Circuit held that the CDA barred the plaintiffs' claims as a matter of law. Id. at 24. Despite the plaintiffs' efforts to plead their claims only in terms of Backpage.com's acts, third-party content was "an essential component of each and all of the appellants' TVPRA claims." Id. at 22. In other words, the duty Backpage.com allegedly violated derived from its role as a publisher. It did not affect the First Circuit's analysis that Backpage.com was alleged to have deliberately designed its website to facilitate sex trafficking. As mentioned earlier, § 230(c)(1) contains no good faith requirement, so "[s]howing that a website operates through a meretricious business model is not enough to strip away [the CDA's] protections." Id. at 29.

¶47 The court of appeals relied heavily on J.S. v. Vill. Voice Media Holdings, L.L.C., 359 P.3d 714 (Wash. 2015). In J.S., which involved claims against the operator of backpage.com on substantially the same facts as in Jane Doe No. 1 v. Backpage.com, LLC, the plaintiffs made the same argument as the Jane Doe No. 1 plaintiffs, asserting that backpage.com was deliberately designed to facilitate sex trafficking. The Washington Supreme Court concluded that the plaintiffs' allegation of intent was enough to escape the reach of the CDA. J.S., 359 P.3d at 718.

¶48 J.S. is unpersuasive for two reasons. First, Washington's pleading standard is much different than Wisconsin's. Under Washington law, a complaint may be dismissed for failure to state a claim "only if it appears beyond a

26

reasonable doubt that no facts exist that would justify recovery." Id. at 716 (citation omitted). Washington courts may consider "hypothetical facts" that were not pled. Therefore, a complaint may not be dismissed "if any set of facts could exist that would justify recovery," whether such facts were pled in the complaint or not. Hoffer v. State, 755 P.2d 781, 785 (Wash. 1988). For this reason, Washington courts may grant motions to dismiss "only in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." J.S., 359 P.3d at 716. This pleading standard is inconsistent with Wisconsin's pleading standard. See Data Key Partners, 356 Wis. 2d. 665, ¶21 ("a complaint must plead facts, which if true, would entitle the plaintiff to relief.").

¶49 More importantly, the Washington Supreme Court ignored the text of the CDA, and the overwhelming majority of cases interpreting it, by inserting an intent exception into § 230(c)(1). The Washington Supreme Court opined that "[i]t is important to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking . . . because 'a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct.'" J.S., 359 P.3d at 718 (citing Roommates.com, 521 F.3d at 1168). Underlying this statement is the implicit assumption that a website operator's subjective knowledge or intent may transform what would otherwise be a neutral tool into a "material contribution" to

27

the unlawfulness of third-party content. As explained in Section II. C., however, this assumption has no basis in the text of § 230(c)(1). The relevant inquiry, regardless of foreseeability or intent, is "whether the cause of action necessarily requires that the defendant be treated as the publisher or speaker of content provided by another." Backpage.com, LLC, 817 F.3d at 19 (citing Barnes, 570 F.3d at 1101-02).

¶50 In this case, all of Daniel's claims against Armslist require the court to treat Armslist as the publisher or speaker of third-party content. Daniel's negligence claim asserts that Armslist had a duty to exercise "reasonable care" in "facilitating" the sale of guns, and had a duty to employ "sufficient questioning and screening" to reduce the risk of foreseeable injury to others. The complaint alleges that Armslist breached this duty by designing armslist.com to "facilitate" illegal gun sales, as well as by failing to implement sufficient safety measures to prevent the unlawful use of its website.

¶51 Daniel's negligence claim is simply another way of claiming that Armslist is liable for publishing third-party firearm advertisements and for failing to properly screen who may access this content. The complaint alleges that Armslist breached its duty of care by designing a website that could be used to facilitate illegal sales, failing to provide proper legal guidance to users, and failing to adequately screen unlawful content. Restated, it alleges that Armslist provided

28

an online forum for third-party content and failed to adequately monitor that content. The duty Armslist is alleged to have violated derives from its role as a publisher of firearm advertisements. This is precisely the type of claim that is prohibited by § 230(c)(1), no matter how artfully pled.

¶52 That Armslist may have known that its site could facilitate illegal gun sales does not change the result. Because § 230(c)(1) contains no good faith requirement, courts do not allow allegations of intent or knowledge to defeat a motion to dismiss. See, e.g., Roommates.com, 521 F.3d at 1174-75. Regardless of Armslist's knowledge or intent, the relevant question is whether Daniel's claim necessarily requires Armslist to be treated as the publisher or speaker of third-party content. Because it does, the negligence claim must be dismissed.

¶53 The negligence per se claim is dismissed for the same reason. Daniel alleges that Armslist "violated federal, state, and local statutes, regulations, and ordinances" by facilitating Haughton's purchase of a firearm. It is true that in Wisconsin, "'one who violates a criminal statute must be held negligent per se in a civil action for damages based on such violation.'" Bennett v. Larsen Co., 118 Wis. 2d 681, 692-93, 348 N.W.2d 540 (1984). As with the negligence claim, however, Daniel's only basis for alleging that Armslist violated any statute, regulation, or ordinance requires Armslist to be treated as the publisher or speaker of Linn's post.

29

¶54 Similarly, the aiding and abetting tortious conduct claim asserts that Armslist "aided, abetted, encouraged, urged, and acquiesced in" Linn's illegal sale to Radcliffe by "brokering" the transaction. However, there is no allegation that Armslist's participation in the transaction went beyond creating a forum for Linn's advertisement and failing to prohibit Radcliffe from viewing the advertisement. This claim would therefore require Armslist to be treated as the publisher of the advertisement and must be dismissed.

¶55 The public nuisance claim is dismissed for the same reason. Daniel asserts that Armslist "negligently, recklessly, and/or intentionally facilitate[ed] the sale of vast quantities of guns" to prohibited purchasers, resulting in a "substantial and unreasonable interference with the public's health, safety, convenience, comfort, peace, and use of public property and/or private property." The act or omission alleged to have created the nuisance is Armslist's provision of a forum for third parties to post and view firearms advertisements. In other words, the duty Armslist is alleged to have violated derives from its role as a publisher of third-party content. Accordingly, the public nuisance claim is dismissed.

¶56 Daniel's civil conspiracy claim does not allege that Armslist conspired with Linn to sell a firearm to a known prohibited purchaser; rather, it alleges that Armslist, LLC's members conspired with one another to create a marketplace for illegal firearm sales, and "advised, encouraged, or assisted" Armslist, LLC in facilitating unlawful firearm sales. Again,

30

the complaint does not allege that Armslist's role in facilitating these illegal transactions went beyond creating a forum on which third parties could post and view firearm advertisements. As with the claims discussed above, the civil conspiracy claim is another way of stating that Armslist is liable for publishing third-party content. The civil conspiracy claim is therefore dismissed.

¶57 All of Daniel's remaining claims——negligent infliction of emotional distress, wrongful death and piercing the corporate veil——are dependent on the claims we have discussed above. Because all of those claims have been dismissed, Daniel's claims for negligent infliction of emotional distress, wrongful death and piercing the corporate veil are dismissed as well. Accordingly, the circuit court did not err when it granted Armslist's motion to dismiss

### III.  CONCLUSION

¶58 We conclude that 47 U.S.C. § 230(c)(1) requires us to dismiss Daniel's complaint against Armslist. Section 230(c)(1) prohibits claims that treat Armslist, an interactive computer service provider, as the publisher or speaker of information posted by a third party on its website. Because all of Daniel's claims for relief require Armslist to be treated as the publisher or speaker of information posted by third parties on armslist.com, her claims are barred by § 230(c)(1). Accordingly, we reverse the decision of the court of appeals and affirm the circuit court's dismissal of Daniel's complaint.

31

*By the Court.*—The decision of the court of appeals is reversed.

¶59  SHIRLEY S. ABRAHAMSON, J., withdrew from participation before oral argument.

¶60 ANN WALSH BRADLEY, J. *(dissenting).* The majority views Daniel's complaint as merely "artful pleading," disguising her true claims against Armslist. By using the phrase "artful pleading," the majority implicitly acknowledges that the language of the complaint states a claim. In essence, it posits, "I know that's what it says, but that's not what it really means."

¶61 What the majority would call "artful pleading," I would instead call the plain language of the complaint——which at this stage of the proceedings, the law mandates we accept as true.[1]

¶62 The complaint alleges that Zina Daniel Haughton sought and received a restraining order against her husband, Radcliffe Haughton, after he assaulted her and threatened her life. Majority op., ¶3. Pursuant to the restraining order, Radcliffe was prohibited from owning a firearm for a period of four years. Id.; see Wis. Stat. § 941.29(1m)(f).[2]

¶63 Within two days Radcliffe had a gun in his hands. See Majority op., ¶3. And within three days, Radcliffe went to

---

[1] For purposes of our review, we must accept the allegations of Daniel's complaint as true. PRN Assocs. LLC v. State, DOA, 2009 WI 53, ¶27, 317 Wis. 2d 656, 766 N.W.2d 559; see Meyers v. Bayer AG, Bayer Corp., 2007 WI 99, ¶81, 303 Wis. 2d 295, 735 N.W.2d 448 (Roggensack, J., dissenting) (citation omitted).

[2] Wis. Stat. § 941.29(1m)(f) provides that a person who possesses a firearm is guilty of a Class G felony if "[t]he person is subject to an injunction issued under s. 813.12 or 813.122 . . . that includes notice to the respondent that he or she is subject to the requirements and penalties under this section and that has been filed under s. 813.128(3g)."

1

Zina's place of employment, and in front of her daughter, shot and killed Zina. He also murdered two other people, injured four others, and then shot and killed himself. Id., ¶4.

¶64 Radcliffe quickly and easily, without undergoing the inconvenience of a federal background check, procured a gun using a website designed by Armslist. The complaint avers that Armslist designed its website with the specific purpose of skirting federal gun laws.

¶65 Nevertheless, the majority allows Armslist to hide behind the Communications Decency Act (CDA), which affords immunity to websites if a plaintiff's claims treat the website "as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The allegations here, however, assert liability for Armslist not based on content provided by another. Rather, the allegations assert liability based on design content Armslist alone created.

¶66 In my view, the majority errs in its interpretation of the CDA by basing its decision not on the actual claims pled in the complaint but on its own manufactured interpretation of those claims. As a result, it fails to recognize that here the design itself is the creation of content.[3] Accordingly, I respectfully dissent.

---

[3] Examples of design content are ubiquitous. One need look no further than the design content of algorithms, used to influence everything from where we shop to the sentencing of criminals. See State v. Loomis, 2016 WI 68, 371 Wis. 2d 235, 881 N.W.2d 749. The parameters of "content" extend beyond simply words on a page.

2

I

¶67 The complaint alleges that Radcliffe was hastily able to procure this gun by using Armslist.com, a website that serves as an online marketplace for firearms. Majority op., ¶¶1, 3. He focused his search for a gun exclusively on Armslist "because he knew that he could not acquire a firearm from a licensed dealer or from a private seller in his community who knew him, and that any contact with a legitimate seller could result in his plan of illegally purchasing a firearm being revealed to law enforcement authorities."

¶68 Importantly, unlicensed private sellers are not required under federal law to conduct background checks on individuals attempting to purchase firearms. See 18 U.S.C. §§ 922(t); 18 U.S.C. § 923(a). Allowing and encouraging prohibited purchasers like Radcliffe to circumvent the laws governing licensed firearm dealers, Armslist incorporated a search function that allows potential gun buyers to exclude licensed dealers from their queries.

¶69 The day after the issuance of the restraining order against him, Radcliffe took action to accomplish his goal. After seeing on Armslist an advertisement for an FNP-40 semiautomatic handgun and three high-capacity magazines of ammunition, Radcliffe contacted the seller of the items, Devin Linn, using Armslist's "contact" function. The gun was listed for $500, a cost higher than what would have been paid by a legitimate buyer for the same weapon and ammunition. Radcliffe

3

advised Linn in a phone call that "he needed the firearm as soon as possible."

¶70 Consistent with Radcliffe's desire for a fast transaction, he and Linn met the following morning. Linn handed over the gun and ammunition, no questions asked. Despite erratic behavior on Radcliffe's part, Linn sold Radcliffe the weapon without determining whether he was a felon, whether he was subject to a restraining order or whether he had been adjudicated mentally ill. He made no inquiry whatsoever.

¶71 After Radcliffe took the weapon he purchased from Linn and used it to kill Zina and two other people, Zina's daughter Yasmeen Daniel brought this lawsuit. The theory of liability advanced focused on Armslist's conduct: "the Armslist Defendants designed Armslist.com specifically to exploit and profit from the background check exception for private sellers, to enable the sale of firearms to prohibited and otherwise dangerous people, and to enable illegal firearm sales, including sales that avoid federal restrictions on interstate transfers, state-imposed waiting periods, and state-specific assault weapon restrictions."

¶72 Daniel further alleged that "[t]he Armslist Defendants knew, or should have known, that the design and architecture of Armslist.com creates a near-certainty that prohibited purchasers will use the marketplace to buy firearms, and that the marketplace will be used for illegal gun sales, including by unlicensed individuals that are engaged in the business of selling firearms." In Daniel's estimation, Armslist breached

4

its duty to the public by "[d]esigning Armslist.com to facilitate sales to prohibited purchasers, such as Radcliffe Haughton."

¶73 Armslist moved to dismiss the claims against it based on CDA immunity. The circuit court granted the motion to dismiss and the court of appeals unanimously reversed.

¶74 Now reversing the court of appeals, the majority determines that Armslist is immune from Daniel's claims pursuant to the CDA. Majority op., ¶2. In the majority's view, "all of Daniel's claims for relief require Armslist to be treated as the publisher or speaker of information posted by third parties . . . ," entitling it to CDA immunity. Id. It further opines that "Daniel's negligence claim is simply another way of claiming that Armslist is liable for publishing third-party firearm advertisements and for failing to properly screen who may access this content." Id., ¶51.

II

¶75 This case presents a discrete question of statutory interpretation. As the court of appeals in this case correctly stated, "[t]he sole and limited issue is whether the complaint seeks to hold Armslist liable on a basis prohibited by the Act." Daniel v. Armslist, LLC, 2018 WI App 32, ¶28, 382 Wis. 2d 241, 913 N.W.2d 211.

¶76 The statute at issue is the CDA, 47 U.S.C. § 230(c)(1), which provides: "No provider or user of an interactive computer service shall be treated as the publisher

5

or speaker of any information provided by another information content provider."

¶77 Another nearby provision states the preemptive effect of the CDA: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). The CDA is a purveyor of immunity, but it "was not meant to create a lawless no-man's-land on the Internet." Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1164 (9th Cir. 2008).

¶78 Our inquiry is limited to whether the plaintiff's theory of liability (that Armslist designed its website to facilitate illegal gun purchases) treats Armslist as the speaker or publisher of Linn's and Radcliffe's posted advertisements. The court of appeals, subscribing to a plain language interpretation of the CDA, concluded that "Congress limited immunity to a single circumstance: when a theory of liability treats the website creator or operator 'as the publisher or speaker of any information provided by another information content provider.' Nothing in this language speaks more generally to website design and operation." Daniel, 382 Wis. 2d 241, ¶42.

¶79 In the court of appeals' view, the content for which Daniel seeks liability "is not 'information provided by another information content provider.' Rather, it is content created by

6

Armslist, and there is no language in the Act immunizing Armslist from liability based on content that it creates." Id., ¶44.

¶80 I agree with the court of appeals' unanimous determination. A close reading of Daniel's complaint indicates that the complaint is not seeking to hold Armslist liable for any content created by a third party. The complaint does not allege that Armslist is liable due to the advertisements posted by Radcliffe and Linn. Instead, it alleges that Armslist is liable for its own content, i.e. the design and search functionality of its website.

¶81 "Where it is very clear that the website directly participates in developing the alleged illegality . . . immunity will be lost." Fair Hous. Council, 521 F.3d at 1174. Such is the allegation here.

¶82 As the court of appeals observed, this conclusion is supported by the Washington Supreme Court's interpretation of the CDA in J.S. v. Village Voice Media Holdings, LLC, 359 P.3d 714 (Wash. 2015). In J.S., a victim of sex trafficking filed suit against Backpage, a website that allowed hosted advertisements offering sexual services. Id., ¶¶2-3. She alleged that the website "is not immune from suit in part because its advertisement posting rules were 'designed to help pimps develop advertisements that can evade the unwanted attention of law enforcement, while still conveying the illegal message." Id., ¶3.

7

¶83 The J.S. court observed that its determination "turns on whether Backpage merely hosted the advertisements that featured J.S., in which case Backpage is protected by CDA immunity, or whether Backpage also helped develop the content of those advertisements, in which case Backpage is not protected by CDA immunity." Id., ¶11. Backpage moved to dismiss, claiming CDA immunity, but the court allowed J.S.'s claims to proceed.

¶84 In doing so, the J.S. court examined the allegations of the complaint, and taking them as true, determined that they "would show Backpage did more than simply maintain neutral policies prohibiting or limiting certain content." Id., ¶12.[4] Following the same mode of analysis here, Armslist is not entitled to CDA immunity.

---

[4] The majority's attempt to distinguish and dismiss J.S. is unpersuasive. See majority op., ¶¶48-49. First, the majority fails to explain how using Wisconsin's pleading standard instead of Washington's would change the result. Contrary to the majority's assertion, the J.S. court did not base its determination on any "hypothetical facts." Rather, it took the allegations of the complaint as true, just as we do in Wisconsin. See J.S. v. Village Voice Media Holdings, LLC, 359 P.3d 714, ¶12 (Wash. 2015) ("Viewing J.S.'s allegations in the light most favorable to J.S., as we must at this stage, J.S. alleged facts that, if proved true . . . "); Data Key Partners v. Permira Advisers LLC, 2014 WI 86, ¶18, 356 Wis. 2d 665, 849 N.W.2d 693 ("When we review a motion to dismiss, factual allegations in the complaint are accepted as true for purposes of our review.").

Second, the J.S. court did not establish an "intent exception" to CDA immunity as the majority claims, but merely recognized a distinction that is manifest in the CDA's text: the distinction between first-party created content and third-party created content. See majority op., ¶49.

¶85 Specifically, Daniel alleges in her complaint that "[o]ne of the most prominent features of Armslist's search function is the ability to search for only private sellers, thereby eliminating from search results any sellers required to perform a background check." No one but Armslist is alleged to be responsible for this feature.

¶86 Daniel further asserts that this feature was intentionally created "specifically to exploit and profit from the background check exception for private sellers, to enable the sale of firearms to prohibited and otherwise dangerous people, and to enable illegal firearm sales, including sales that avoid federal restrictions on interstate transfers, state-imposed waiting periods, and state-specific assault weapon restrictions." Again, no one but Armslist is alleged to be responsible for this design.[5]

---

[5] Justice Wiggins's concurrence in J.S. is particularly insightful in examining the facts alleged in Daniel's complaint in this case. Narrowly interpreting the CDA, Justice Wiggins wrote:

> Plaintiffs do not argue that Backpage.com necessarily induces the posting of unlawful content by merely providing an escort services category. Instead, plaintiffs allege that Backpage.com deliberately designed its posting rules in a manner that would enable pimps to engage in sex trafficking, including in the trafficking of minors, and to avoid law enforcement. These factual allegations do not suggest that Backpage.com is being treated as a "publisher or speaker."

J.S. v. Village Voice Media Holdings, 359 P.3d 714, ¶30 (Wash. 2015) (Wiggins, J., concurring); see also Mary Graw Leary, The Indecency and Injustice of Section 230 of the

(continued)

9

¶87 The majority contends that "all of Daniel's claims for relief require Armslist to be treated as the publisher or speaker of information posted by third parties . . . ." Majority op., ¶2. Further, the majority claims that its decision "prevents plaintiffs from using 'artful pleading' to state their claims only in terms of the interactive computer service provider's own actions, when the underlying basis for liability is unlawful third-party content published by the defendant." Majority op., ¶43.

¶88 But the majority's approach requires the court to ignore the literal words used in the complaint. In its endeavor to brand Daniel's complaint as "artful pleading," it ties itself in knots to avoid the actual claims Daniel makes.

¶89 Such an approach deviates from established practice that plaintiffs are the masters of their complaints. See Caterpillar, Inc. v. Williams, 482 U.S. 386, 398-99 (1987). Rather than applying the complaint's plain language, the majority manufactures an interpretation. Embarking upon a legally unsupportable approach, it fails to recognize that here the design itself is content and ignores the distinction between first-party created content and third-party created content.

¶90 The complaint sets forth that Daniel is seeking liability against Armslist for Armslist's conduct only. We

---

Communications Decency Act, 41 Harv. J. of Law & Pub. Pol'y 553, 587-591 (2018).

10

should take the complaint at face value.[6]  Accordingly, Armslist is not entitled to CDA immunity.

¶91  For the foregoing reasons, I respectfully dissent.

---

[6] Further, I observe that my conclusion is not at odds with the bulk of CDA jurisprudence.  For example, in Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997), a seminal CDA case, the Fourth Circuit determined that "§ 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role.  Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions——such as deciding whether to publish, withdraw, postpone or alter content——are barred."

Zeran and its progeny are not disturbed by my conclusion.  My analysis and Zeran peacefully coexist because they deal with different factual allegations——liability for third party content vs. liability for first party content.